Walter A. MITCHELL, Appellee and Cross-Appellant,

v.

TEXAS GULF SULPHUR COMPANY et al., Appellant and Cross-Appellee.

George Gordon REYNOLDS, Appellee and Cross-Appellant,

v.

TEXAS GULF SULPHUR COMPANY et al., Appellant and Cross-Appellee.

Arthur R. STOUT et al., Appellees and Cross-Appellants,

v.

TEXAS GULF SULPHUR COMPANY et al., Appellant and Cross-Appellee.

Nos. 280–70 to 285–70.

United States Court of Appeals, Tenth Circuit.

April 26, 1971.

Rehearing Denied in Nos. 281–70, 283–70 Sept. 10, 1971.

Calvin A. Behle, Salt Lake City, Utah, Orison S. Marden and P. B. Konrad Knake, New York City (Thomas McGanney, New York City, on the brief), for appellant and cross-appellee.

Roy G. Haslam, Salt Lake City, Utah, for appellee and cross-appellant Mitchell.

Parker M. Nielson, Salt Lake City, Utah, for appellee and cross-appellant Reynolds.

O. Wood Moyle, III, Salt Lake City, Utah (Oscar W. Moyle, Jr., and Verle C. Ritchie, Salt Lake City, Utah, on the brief), for appellees and cross-appellants Stout and others.

Before LEWIS, Chief Judge, and HILL and McWILLIAMS, Circuit Judges.

HILL, Circuit Judge.

Appellees and cross-appellants Reynolds, Mitchell and Stout instituted actions in the Utah district against appellants and cross-appellees Texas Gulf Sulphur Company (hereinafter referred to as TGS) and Charles A. Fogarty, one of the principal officers of the company, to recover damages for violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder. The actions were consolidated for trial to the court without a jury and plaintiffs procured judgments in the three cases.[1]

While the complaints of the several parties make varying allegations of legal infractions,[2] the cases were tried, and are appealed, only upon alleged violations of Section 10(b) and Rule 10b–5,

---

1. The trial court's opinion, including findings and conclusions, is reported in 309 F. Supp. 548.

2. One complaint included a count in common law fraud, another alleged a conspiracy to violate the Act and Rule, and one alleged violation of fiduciary duties and violations of Section 9 of the Act.

with a cross-appeal by Reynolds and Mitchell on the issues of damages and class action claims. Specifically, the claim is that appellees were damaged by the violations of TGS and Fogarty, its executive vice president, (1) for failure to disclose on April 12 and prior to April 16, 1964, information as to the results of drilling at the Timmins property; and (2) in issuing an inaccurate, misleading and deceptive press release published April 13, 1964.

The essential facts are as follows: Reynolds, Mitchell and Stout were and had been for several years stockholders in TGS. After several years of extensive mineral exploration on the Canadian Shield of eastern Canada, TGS detected a promising anomaly on a plot of land known as the Kidd 55 segment near Timmins, Ontario, Canada. In November, 1963, TGS core-drilled the anomaly at its "strongest" point. The hole was designated K–55–1 and was completed November 12 at a depth of 655 feet. High ore content was indicated by visual examination, and after the core was split and sent to Utah for assay, it disclosed an average mineral content of 1.18% copper, 8.2% zinc, and 3.94 ounces of silver per ton, over a length of 602 feet. In response to the preliminary results, the TGS chief geologist wrote in a November 14, 1963, memorandum that this was "obviously of ore-grade"[3] but that "a great deal of caution must be exercised in extrapolating this intersection to tonnage estimates."

At this stage of the operations TGS owned only a fraction of the Kidd 55 property. Extreme precautions were taken to the end that no outsider would gain knowledge of the results of the explorations. By March, 1964, TGS had acquired without difficulty substantially all interest in the promising acreage adjacent to the drill site.

On April 7, 1964, K–55–3 was completed. The mineral content, by visual examination of the core, compared favorably with K–55–1 and eliminated the chances that the latter had been drilled "down dip". This hole aided in roughly establishing the east-west boundaries of the sulfite ore body. K–55–4 was completed to a 578 foot depth by 7:00 p. m., April 10, and produced a core comparable to K–55–1 and –3. K–55–4 had been drilled 200 feet south of K–55–1, on a 45 degree angle toward the west. Holes K–55–5 and K–55–6 had been started and were drilling by 7:00 p. m. April 10. K–55–5, 200 feet north of K–55–1 and on a 45 degree angle to the west, had encountered substantial copper mineralization over 42 feet of the 97 feet then drilled. K–55–6, 300 feet east of K–55–1 and on a 60 degree angle to the west, had encountered substantial copper mineralization over the last 127 feet of the 569 foot hole.

Between 7:00 p. m., April 10 and 7:00 p. m., April 12 (the evening prior to the first release) more data became available. K–55–5 was at the 531 foot level and had continued to encounter substantial copper mineralization over that entire length. During the same interval, K–55–6 had reached a depth of 881 feet and had found mineralization over the length of this intermediate drilling. Meanwhile, K–55–7 was started approximately 400 feet north of K–55–1 on a westerly 45 degree angle and was at 91 feet and showing mineralization. And K–55–8 was drilling at a depth of 162 feet without report as to its mineral content.

By the morning of April 13, K–55–5 had encountered substantial copper mineralization to the 580 foot mark; K–55–6 had found mineralization to the 946 foot level; and 50 feet of the 137 feet drilled at K–55–7 showed mineralization. By April 16, K–55–1, –2, –3, –4, –5, –6, and –8 were completed. K–55–7 was at 613 feet, –9 was at 373 feet, and –10 was at 123 feet. In a thumbnail sketch, this illustrates the rapid fire manner in which data was being accumulated at the Timmins drill site.

3. "Ore" is a word of art which indicates a body of commercially minable minerals.

Although TGS sought to suppress the nature and extent of its discovery at Timmins, by early 1964, rumors had begun to generate excitment about the alleged strike. By April, 1964, property within several miles of the TGS site had been "staked". Canadian newspapers carried the rumors, and of their effect on the Toronto Stock Exchange, proclaimed by one to be "the wildest speculative spree since the Nineteen Fifties." Eventually the rumors worked south to the United States.

On Saturday, April 11, 1964, both the New York Times and the Herald Tribune carried stories on the rumored strike.[4] In response to the Times and Herald Tribune articles, the president of TGS directed Fogarty to prepare an official TGS statement. The president, a vice president and Fogarty all agreed that they could not responsibly conclude that a commercial ore body existed and that no calculations as to the size or grade of ore could be made without further drilling. Fogarty then drafted a statement based upon data gathered as of 7:00 p. m., April 10, and he released the statement Sunday afternoon, April 12.[5]

4. The Herald Tribune article follows in part:

"The biggest ore strike since gold was discovered more than 60 years ago in Canada has stampeded speculators to the snowbound old mining city of Timmins, Ontario, some 450 miles northwest of Toronto.

"This time it's copper. Texas Gulf Sulphur Co., Ltd., which reportedly has made an unparalleled find in the Big Water Lake area about 15 miles north of Timmins, would not confirm reports of the strike.

\* \* \* \* \* \* \* \*

"The story of the strike goes something like this: \* \* \* The richness of the copper it [TGS] discovered was so great that samples reportedly were flown out of the country to be assayed.

"The huge lode is supposed to consist of a bed of copper sulfite 600 feet wide with a possible overall copper return of 2.87 per cent through most of its width. \* \* \*

"But the richest yield comes from the first 100 feet of that 600 foot belt. It is supposed to be 5.6 per cent, a bonanza if the story proves more than just a myth. But myth it may be.

\* \* \* \* \* \* \* \*

"PCE Explorations reportedly is the company which worked with Texas Gulf Sulphur to make the strike.

\* \* \* \* \* \* \* \*

"Sources in Timmins said, four diamond drilling machines are working on Texas Gulf land, with four more machines slated to begin drilling next week. \* \* \* "

5. "During the past few days, the exploration activities of Texas Gulf Sulphur in the area of Timmins, Ontario, have been widely reported in the press, coupled with rumors of a substantial copper discovery there. These reports exaggerate the scale of operations, and mention plans and statistics of size and grade of ore that are without factual basis and have evidently originated by speculation of people not connected with TGS.

"The facts are as follows. TGS has been exploring in the Timmins area for six years as part of its overall search in Canada and elsewhere for various minerals—lead, copper, zinc, etc. During the course of this work, in Timmins as well as in Eastern Canada, TGS has conducted exploration entirely on its own, without the participation by others.

"Numerous prospects have been investigated by geophysical means and a large number of selected ones have been core-drilled. These cores are sent to the United States for assay and detailed examination as a matter of routine and on advice of expert Canadian legal counsel. No inferences as to grade can be drawn from this procedure.

"Most of the areas drilled in Eastern Canada have revealed either barren pyrite or graphite without value; a few have resulted in discoveries of small or marginal sulphide ore bodies.

"Recent drilling on one property near Timmins has led to preliminary indications that more drilling would be required for proper evaluation of this prospect. The drilling done to date has not been conclusive, but the statements made by many outside quarters are unreliable and include information and figures that are not available to TGS.

"The work done to date has not been sufficient to reach definite conclusions and any statement as to size and grade of ore would be premature and possibly misleading. When we have progressed to the point where reasonable and logical conclusions can be made, TGS will issue a definite statement to its stockholders and to the public in order to clarify the Timmins project. \* \* \* "

By TGS invitation, on April 13, a reporter from a Canadian mining journal, The Northern Miner, visited the Kidd–55 drilling site. The article detailing that visit was published April 16, and indicated that this "must be recorded as one of the most impressive drill holes completed in modern times." That same day, at 10:00 a. m. Eastern Standard Time, Fogarty held a second press conference and released a statement which revealed in some detail the magnitude of the discovery at Timmins.[6] Summaries of this announcement appeared on the private wire service of Merrill Lynch and on the Dow-Jones wire service shortly thereafter.

Reynolds, Mitchell and the Stouts testified that they sold their TGS stock after hearing of the April 12 release but

6. "Texas Gulf Sulphur has made a major discovery of zinc, copper and silver in the Timmins area of Ontario, Canada.

"We announced last Sunday that when Texas Gulf had done sufficient work to reach firm conclusions, the company would issue a definite public statement on the Timmins project. We are now prepared to make that statement.

"Just ten days ago TGS had but one drilling rig operating in this area. As we state in our release of April 12, initial drilling on this one prospect had led to preliminary indications that more drilling would be required for proper evaluation. We immediately moved in additional drills so that by April 12 four drills were operating. With four drills, considerably more data has been accumulated.

"Seven drill holes are now essentially complete and indicate an ore body of at least 800 feet in length, 300 feet in width and having a vertical depth of more than 800 feet.

"We have not yet delimited the ore body in either direction along the strike. We have only drilled to a vertical depth of 800 feet. Values remain consistent to that depth.

"This is a major discovery. Preliminary data indicate a reserve of more than 25 million tons of ore. The only hole assayed so far represents over 600 feet of ore, indicating a true ore thickness of nearly 400 feet. The hole is described as follows:

"Overburden is 24 feet. The initial core recovered showed 1 per cent copper over 24 feet. This was followed by a heavy chalcopyrite section of 82 feet, which assayed 7 per cent copper, 9.7 per [sic] zinc, and 2.4 ounces of silver. An additional 20 feet of massive sulphide assayed 12 per cent zinc. Disseminated sphalerite occurred through the following 44 feet of rock and this section assayed nearly 5 per cent zinc. A silver-rich zone of 36 feet followed, assaying 0.8 per cent copper, 13 per cent zinc, and 10.5 ounces of silver. An additional 16 feet assayed 4 per cent zinc and over 5 ounces of silver.

"The following 100 feet was zinc-rich and assayed 0.33 per cent copper, 14.3 per cent zinc and 4 ounces of silver. A 106 foot section of core assaying 8 per cent zinc and 7.2 ounces of silver followed 36 feet of massive pyrite, assaying 3.4 per cent zinc, and 4 ounces of silver. A graphitic zone for the following 86 feet contained approximately 4 per cent zinc and 2 ounces of silver. The final 20 feet assayed 8.3 per cent zinc and 2 ounces of silver. The overall interval of mineralization which could be mined in an open pit operation averaged 1.18 per cent copper, 8.1 per cent zinc, and 3.8 ounces of silver over a core length of 602 feet. The true width of the overall mineral zone is approximately 400 feet.

"Visual examination of cores from the other holes indicates comparable grade and continuity of ore.

"The ore body is at shallow depth, having only some 20 feet of overburden. This means that it can easily be mined initially by the open pit method.

"This discovery is in the northeast part of Kidd Township, and is about ten miles north of the Timmins airport.

"Our land position is favorable. Texas Gulf holds the mineral rights in 70 per cent of Kidd Township and has substantial acreage in the adjacent townships.

"TGS has been exploring in the Timmins area for some six years, using its own geophysical methods, followed by core drilling. Many prospects were drilled before this strike.

"TGS is actively continuing in the area, and in addition to this discovery is presently drilling on another prospect in the same township. We are continuing our exploration and are proud of our small but exceptionally competent exploration staff.

"We are continuing to drill this structure as systematically and rapidly as possible to determine its limits. We hope to have more information concerning this important discovery at the time of our stockholders' meeting on April 23 in Houston, Texas."

before becoming aware of the April 16 release. Sometime after the first release was published, Reynolds' broker in Salt Lake informed him as to its general content. On April 16, the broker relayed rumors that TGS had made a strike but in the broker's judgment this was mere propaganda. Reynolds then testified that he decided "to get out while the getting was good," whereupon he sold his 500 shares. Later that afternoon he learned of the favorable TGS report. He testified that had he known of the K–55–1 core results he would have doubled his holdings.

Mitchell visited his broker on the afternoon of the sixteenth, at which time he was referred to the April 12 release. He concluded that the stock would not sustain its current rise and gave instructions to sell 400 shares short against the box. Then, realizing he had failed to dispose of 20 shares, he delivered them on the seventeenth with similar sell instructions. According to his testimony, he had no knowledge of the April 16 release when he sold. After hearing about the April 12 release and that the TGS Timmins discovery was overrated, the Stouts gave orders to sell their 1,000 shares on April 21.

This controversy was tried to the court without a jury. On the basis of the testimony and exhibits produced at that trial, the district court made findings of fact and conclusions of law. To the extent that appellants' arguments rest upon a relitigation or reassessment of factual matters, we will defer to the trial court unless we are satisfied that they were clearly erroneous. Rule 52 F.R.Civ. P., 28 U.S.C. Fireman's Fund Ins. Co. v. S.E.K. Construction Co., Inc., 436 F.2d 1345 (10th Cir. 1971); Butler Paper Co. v. Business Forms, Ltd., 424 F.2d 247 (10th Cir. 1970); Knauff v. Utah Construction and Min. Co., 408 F.2d 958 (10th Cir. 1969).

The trial court found that the press release of April 12 was false, misleading, deceptive and fraudulent with respect to material matters disclosed by the company's drilling efforts; that the authors knew of the presence of ore-grade copper and zinc in major proportions; that the magnitude of the discovery was either misstated or concealed; and that TGS and Fogarty knew the press release statements were incorrect and misleading, and knew or should have known that the statements would be relied upon by shareholders. After finding that each appellee had relied on the April 12 release in selling his TGS stock, the court awarded damages based on the average of the highest daily per share selling price between April 16, 1964, and May 13, 1964, twenty trading days following the last press release.

Rule 10b–5 is plain, concise and unambiguous. It provides as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(1) To employ any device, scheme, or artifice to defraud,

(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

Neither Rule 10b–5 nor Section 10(b) in terms grants a private right of action for the nonfeasance or malfeasances denoted in their language. But this is of miniscule significance in this litigation, presumably because such right has now been recognized in all the federal circuits which have had occasion to consider the issue.[7]

7. Rogen v. Ilikon Corp., 361 F.2d 260 (1st Cir. 1966); Heit v. Weitzen, 402 F.2d 909 (2d Cir. 1968); McClure v. Borne Chemical Co., 292 F.2d 824 (3rd

From its origin, the private right of recovery has been based on the general principle of tort law that violation of a provision of a criminal statute designed to prevent a particular type of harm can give rise to a civil remedy. Kardon v. National Gypsum Co., 69 F.Supp. 512 (E.D.Pa.1946). In civil actions instituted on the basis of 10b–5 violations, the keynote of which is fraud, the full panoply of common law fraud elements— misrepresentation or nondisclosure, materality, scienter, intent to defraud, reliance and causation—have crept in and played varying roles of significance. However, a number of these elements have diminished in importance in private actions, and we have stated in Stevens v. Vowell, 343 F.2d 374, 379 (10th Cir. 1965), that "[i]t is not necessary to allege or prove common law fraud to make out a case under the statute and rule. It is only necessary to prove one of the prohibited actions such as the material misstatement of fact or the omission to state a material fact." Notwithstanding, appellants urge that appellees have failed to establish the presence of most of the common law fraud ingredients, i. e., misrepresentation or nondisclosure of material facts, scienter, intent to defraud, reliance, and some semblance of privity. A full measure of our attention will be devoted to each of these constituent parts.

█ The misleading, misrepresented or untruthful character of the release may appear from the nature of the statement considered alone, or, when the facts are fully disclosed, from the half truths, omissions or absence of full candor concealed therein. *See* Gilbert v. Nixon, 429 F.2d 348, 356 (10th Cir. 1970); Meisel v. North Jersey Trust Company, 218 F.Supp. 274 (S.D.N.Y.1963); Cochran v. Channing Corporation, 211 F.Supp.

239 (S.D.N.Y.1962). Misrepresented or omitted facts become material, hence actionable under 10b–5, when, considering the complaining parties as reasonable investors, the disclosure of the undisclosed facts or candid revelation of misleading facts would affect their trading judgment. *See* Gilbert v. Nixon, supra; S. E. C. v. Texas Gulf Sulphur Company, 401 F.2d 833, 849 (2nd Cir. 1968), *cert. den'd sub nom.* Coates v. S. E. C., 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); Rogen v. Ilikon Corporation, 361 F.2d 260, 266 (1st Cir. 1966); List v. Fashion Park, Inc., 340 F.2d 457, 462 (2nd Cir. 1965), *cert. den'd sub nom.* List v. Lerner, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed. 2d 60 (1965). The implicit variables to be weighed in a materiality analysis are the magnitude and probability of the occurrence of the event, set against the size and total activity of the subject company.

█ The trial court found the April 12 release "inaccurate, misleading and deceptive with respect to material matters." Reynolds v. Texas Gulf Sulphur Co., 309 F.Supp. 548, 559 (D.Utah 1970). We agree upon the following recitation of facts found in the record.

To put the chronicle of events in perspective, it must be remembered that from the drilling of K–55–1 in late 1963, no serious drilling activity had transpired until March 31, 1964. On the basis of the core analysis then available to them, the corporate leaders committed themselves to secrecy regarding the "prospect" until the adjacent property could be acquired. Once substantial holdings in contiguous realty was accomplished, drilling activity again came to life with renewed vigor. As of April 10, three drilling rigs were operating, with another to begin drilling on April 12,

Cir. 1961); Beury v. Beury, 222 F.2d 464 (4th Cir. 1955); Rekant v. Desser, 425 F.2d 872 (5th Cir. 1970); Texas Continental Life Ins. Co. v. Dunne, 307 F.2d 242 (6th Cir. 1962); Jordan Building Corp. v. Doyle, O'Connor & Co., 401 F.2d 47 (7th Cir. 1968); City National Bank of Fort Smith, Ark.

v. Vanderboom, 422 F.2d 221 (8th Cir. 1970); Ellis v. Carter, 291 F.2d 270 (9th Cir. 1961); Gilbert v. Nixon, 429 F.2d 348 (10th Cir. 1970); and impliedly in J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) and Surowitz v. Hilton Hotels Corp., 383 U.S. 363, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966).

in an obvious effort to ascertain the dimensions of the mineral body. Daily reports on drilling progress continuously altered the measurements of the body, but the mineralization content continued to retain the same characteristics as the core from K–55–1. The data available to TGS at the time of the first press release was ample to have accorded with a more complete, thereby favorable, statement. The representation that "preliminary indications [are] that more drilling would be required for proper evaluation of this prospect" was not a statement candidly disclosing the available knowledge of TGS. Although the full magnitude of the ore body could not be precisely determined, the available information allowed more than a marginal possibility that a commercial "mine" existed.

The contested press release was issued during the afternoon of Sunday, April 12, and purported to be based on "work done to date" and "drilling done to date." This misrepresents and distorts the actual fact that the information upon which TGS formulated the release was current as of 7:00 p. m., April 10. Only in light of the rapid progression of available drilling information does this become forcefully significant. Between 7:00 p. m. on Friday and late afternoon the following Sunday, these developments occurred: (1) K–55–5 had been drilled another 471 feet to a depth of 531 feet; (2) K–55–6 had been drilled another 301 feet to a depth of 881 feet; (3) K–55–7 had been commenced and was at the 91 foot level; and (4) K–55–8 had been commenced and was at the 105 foot level. Thus at the time of the release, TGS drilling had established the rough east-

west boundaries of the ore body (through K–55–1 and K–55–3) at nearly 300 feet; the zone of ore proceeded south at least 200 feet (K–55–4), strong mineralization was evident 200 feet north (K–55–5) with fair mineralization showing 400 feet north; and the depth was being ascertained (K–55–6) by an 881 foot hole which was still encountering mineralization at that level.

The recitation that "work to date has not been sufficient to reach definite conclusions and any statement as to size and grade of ore would be premature and possibly misleading" is a one-sided statement. No one could dispute that TGS could not have accurately defined the outer limits of the ore body as of April 12, but that is not the test. When TGS undertook to deny and clarify rumor and fact, they were bound to accurately depict the situation as they then knew it. The full magnitude may yet have been a mystery, but armed with the data available on the 12th, TGS was in a position to unveil the then known dimensions and drilling data of their discovery. Having failed to accurately portray what they knew, and commenting that the information was current when in fact it was sorely outdated, TGS misrepresented the facts of the Kidd 55 discovery.

To buttress the findings above, the trial court reiterated that the Northern Miner journalist who was permitted to visit Kidd 55 on April 13 was able to print a detailed story with the approval of TGS.[8] The agreement was that Ackerly would visit the drill site and on the basis of his observation, prepare an article for publication. But it was to be printed only after Mollison, a vice president in charge of the Timmins project,

8. Texas Gulf Sulphur has chalked up a brilliant exploration success * * * a major new zinc-copper-silver mine is definitely in the making * * *.
 * * * On the basis of seven tests either completed or drilling, it can be stated that a strike length of 600 ft. minimum has been established showing an ore width of roughly 300 ft. which has been traced so far to a maximum vertical depth of about 800 ft. * * *. This must be

recorded as one of the most impressive drill holes completed in modern times.
 From the dimensions already known, the Northern Miner can say that something in excess of 10,000,000 tons of ore is indicated. It is capped with something like 20 feet of over-burden, presenting no stripping problems, and the steep dip and wide widths will lend themselves ideally to an open-pit mining situation.

read, edited, and authorized its printing. Just as the trial court, we believe this confirms the finding that TGS knew a great deal more than it told on April 12 and that by concealing, omitting or misrepresenting these facts they violated Rule 10b–5.

Even if it is for the moment assumed that some notation had been made that the information was not current, the release still was false, misleading and deceptive. The rumors were of a "substantial copper discovery." In effect, TGS answered without qualification that these rumors were "without factual basis." Then they proceeded to speak of most areas drilled as revealing "either barren pyrite or graphite without value; a few have resulted in discoveries of small or marginal sulphide ore bodies." It was then stated that more drilling would be required for proper evaluation. Not a single note of encouragement is contained in the entire April 12 release regarding the Kidd 55 drilling. The trial court found the release painted a bleak and gloomy picture, and we agree. The substance of the release was a complete denial of the rumors, without any attempt to relate the favorable prospects as shown by the core assay of K–55–1 and the visual examinations of cores from K–55–3, –4, –5 and –6. Each core, in its own way, added to the confirmation of an exceptional ore discovery. We do not now decide whether TGS would have had to make a statement on the 12th, absent the rumors. But with the described data available it was deceitful and fraudulent to speak as TGS did.

By the testimony of appellees' expert, on April 12, TGS knew or could have conservatively computed the reserves of Kidd 55 at 7,390,000 tons of ore valued at $183,740,000. And by the evening of April 12, sufficient data was available for TGS to calculate the reserves at 11,-790,000 tons valued around $219,740,000. When the trial court, crediting this testimony over that tendered by appellants' expert, put those figures alongside the computation made in the Northern Miner based on April 13 data indicating in excess of 10,000,000 tons, its finding as to inaccuracy and deception are well substantiated and thus sustained.

■ Appellants seek to diminish the credibility of appellees' expert, Dr. Christiansen, by pointing to his method of evaluating the reserves, by urging that his conclusions were based on post-April 10 drilling information and took into account the April 16 release, and it is charged that contemporaneous remarks made by the judge during trial served to discredit Dr. Christiansen's calculations. Addressing the last allegation first, the trial judge ultimately viewed Dr. Christiansen's testimony as credible and notwithstanding the contrary trial colloquy, we are bound by that unless there was clear error. Second, the method employed by appellees' expert did not deviate from professional norms and the proof of that is unerringly highlighted by the content of the April 16 release. Simply because one expert is willing to compute ore reserves upon given data where another refuses, does not destroy the credibility of the first nor improve the reliability of the latter. Dr. Christiansen carefully progressed through the daily series of test cores, logs, etc., and upon the then available data, computed the reserves on the basis of each day's drilling. We can find no error in trusting these computations.

These facts also provide ample foundation for the trial court's finding of materiality. K–55–1 had been assayed and was known to contain minerals of extraordinary quality. The cores from K–55–3 and K–55–4 were visually appraised to be of the same high quality, and the preliminary results of K–55–5, –6 and –7 expanded the limits of the ore body to commercially minable proportions. Additionally, the ore was near the surface to facilitate more economical strip mining. Even considering the size of TGS and its level of operations in international mineral exploration and development, the known size and quality of the ore body was material information; that is, the trading judgment of reasonable investors would not have been left untouched upon

receipt of such information. The trial court was unerringly correct.

■ TGS seeks refuge in the language of the New York Stock Exchange Company Manual which provides that in the face of rumors without factual basis or rumors which need clarification or interpretation, a quick and speedy denial is the recommended procedure.[9]

It would be an unwarranted contortion of this rule to enfold TGS within its protection. First, because of the facts heretofore set forth, it cannot be said that the rumors had no basis in fact. Second, an S.E.C. statement, relied upon by TGS to support their proposition, is contrary to the facts of this case. Directing its attention to rumors circulating about the Alaskan North Slope oil drilling activities, the Commission has warned investors against those rumors because of the intricacies and uncertainties of oil production on the North Slope. The S.E.C. has cautioned the oil companies "to weigh carefully the conclusions and interpretations of information they may use in statements released to the public." TGS has seized onto this language as a characterization of the action they took. But the S.E.C. continued: "While the absence of proved reserves does not preclude *factual disclosures* of exploratory activities, *such as information relating to drilling operations,* any statements which are made should be appropriately qualified to indicate the limitations upon the significance of the facts disclosed." [Emphasis added.]

The duty evolving upon a company facing these circumstances is to speak truthfully, accurately and with total candor as to the material facts. That is not too much to ask of any company with the interest of its shareholders central to its commentary. It is what the S.E.C. de-

mands, what the law requires, and what every stockholder is entitled to. Sunray DX Oil Company v. Helmerich & Payne, Inc., 398 F.2d 447 (10th Cir. 1968), does not forbid this reasoning. In the context of the facts there present, the court felt that a detailed statement would not add to the informed status of investors, but would mislead them due to the nuances of technical terms used in divulging further information. The problems extant in that off-shore drilling case are not present in the instant controversy.

■ It is said that if the courts require factual data in statements such as that originally framed by TGS, issuance of statements will fall out of favor and use. The conjecture is that by requiring a complete statement of material facts, corporations will cease to issue them and the Act will be frustrated in its attempt to keep stockholders informed of material facts. We view this speculation untenable, for the duty to disclose facts when they become material has not been altered by this decision. Simply stated, when the material information is available and ripe for publication, the difficulties inherent in formulating a release cannot overbear the accuracy of the statements contained therein. Nor is it reasonable to conclude that the detail of a full release will preclude its publication in these circumstances. Indeed, the thoroughness of the April 16 release stands as evidence to the contrary.

■ Another argument of appellants is that as a predicate to a 10b–5 action, the corporation, its directors or other "insiders" must be trading in the market.[10] At minimum, it is urged that a market purpose to benefit the alleged wrongdoer must be proven before recovery can be permitted. The attempt is to circumvent the language in SEC v.

9. "Occasions may arise when rumors have been circulated which have no basis in fact or which require clarification or interpretation and also which result in unusual activity or price changes in a particular security. Under such circumstances, the most effective procedure is the quick and speedy denial of such rumors

through a release to the public press." [A–22]

10. Although considerable trading had been done in the market by corporate "insiders" and "tippees", it was stipulated at trial that there was no illegal trading by the instant parties at or after the time of the April 12 release.

Texas Gulf Sulphur Company, 401 F.2d at 862: "Rule 10b–5 is violated whenever assertions are made * * * in a manner reasonably calculated to influence the investing public, e. g., by means of the financial media * * * if such assertions are false or misleading or are so incomplete as to mislead irrespective of whether the issuance of the release was motivated by corporate officials for ulterior purposes. It seems clear, however, that if corporate management demonstrates that it was diligent in ascertaining that the information it published was the whole truth and that such diligently obtained information was disseminated in good faith, Rule 10b–5 would not have been violated."

In its origin, 10b–5 was intended only to give sellers the same protection extended to buyers by other provisions of the Act, and did not contemplate protection of stockholders against a breach of fiduciary duty by corporate insiders. Within a few years, however, the federal courts ceased to look upon the Rule in the narrow context of seller protection and began to see in it a greater purpose, i. e., equalization of bargaining position of the parties on both sides of a transaction. A. Bromberg, Securities Law: Fraud—S.E.C. Rule 10b–5, § 3.2 (200), (300), pp. 65–66 (1969) [hereinafter Bromberg]. But even with this expanded vision, the courts generally required, at minimum, "[a] semblance of privity between the vendor and purchaser of the security in connection with which the improper act, practice or course of business was invoked * * *." Joseph v. Farnsworth Radio & Television Corp., 99 F.Supp. 701, 706 (S.D.N.Y.1951).

The Second Circuit in the Texas Sulphur case expanded this rationale to include protection for open market investors, including speculators, when misled by nontrading insiders. After reviewing Congressional history, the court said: "Congress when it used the phrase 'in connection with the purchase or sale of any security' intended only that the device employed, whatever it might be, be of a sort that would cause reasonable investors to rely thereon, and, in connection therewith, so relying, cause them to purchase or sell a corporation's securities. * * * We do not believe that Congress intended that the proscriptions of the Act would not be violated unless the makers of a misleading statement also participated in pertinent securities transactions in connection therewith, or unless it could be shown that the issuance of the statement was motivated by a plan to benefit the corporation or themselves at the expense of a duped investing public." S. E. C. v. Texas Gulf Sulphur Company, 401 F.2d at 860. TGS invites this circuit to either part company with the Second Circuit rationale or distinguish it on the basis that it must be confined to S.E.C. enforcement actions.

The Second Circuit has laid to rest the argument that the new "connection" requirement be narrowly applied to S.E.C. enforcement actions. Following the TGS suit was Heit v. Weitzen, 402 F.2d 909 (2nd Cir. 1968), a private action, wherein the TGS "connection" rule was applied. We also decline the invitation to ignore the forward looking view of the Second Circuit regarding the "connection" requirement. Perhaps the first step is to realize that the common law requirement of privity has all but vanished from 10b–5 proceedings [11] while the distinguishable "connection" element is retained.[12] In its development, the cases have deemed the "connection" requirement fulfilled if the company has uttered false or misleading statements concerning the securities

11. Heit v. Weitzen, 402 F.2d 909 (2nd Cir. 1968); Texas Continental Life Ins. Co. v. Dunne, 307 F.2d 242 (6th Cir. 1962); Rippey v. Denver U. S. National Bank, 260 F.Supp. 704 (D.Colo.1966); Miller v. Bargain City, U.S.A., Inc., 229 F.Supp. 33 (E.D.Pa.1964); Freed v. Szabo Food Service, Inc. (N.D.Ill., filed Jan. 14, 1964); Bromberg, § 8.5 (511) at 207; III Loss, Securities Regulations, Chap. 11C(c) at 1767–71 and VI Loss, Chap. 11C at 3890–97.

12. See Rippey v. Denver U. S. National Bank, supra; Stockwell v. Reynolds & Co., 252 F.Supp. 215 (S.D.N.Y.1965); Miller v. Bargain City, U.S.A., Inc., supra.

in question, provided the complainants have relied on the misrepresented facts. The result which we here support is that insider trading is not a requisite for 10b–5 violation by misrepresentation. As appropriately stated by the Second Circuit, "a corporation's misleading material statement may injure an investor irrespective of whether the corporation itself, or those individuals managing it, are contemporaneously buying or selling the stock of the corporation." S. E. C. v. Texas Gulf Sulphur Company, 401 F.2d at 861. The trial court had little difficulty finding from the testimony of Fogarty and other corporate officers that the April 12 statement was made in a manner reasonably calculated to influence the investing public. We concur.

■ But even if the release was made in connection with the sale of these securities, appellants further urge that the overwhelming weight of authority holds that scienter in some form is required in a private 10b–5 damage action. *See* VI Loss, Ch. 11C at 3883–90. In the Second Circuit, at least, that description appears to be correct. But while some degree of scienter is required, it does not equate with the intent to defraud required in a common law fraud action. Globus v. Law Research Service, Inc., 418 F.2d 1276 (2nd Cir. 1969); Heit v. Weitzen, supra; Astor v. Texas Gulf Sulphur Company, 306 F.Supp. 1333 (S.D.N.Y.1969). Contrariwise, in the Eighth Circuit, City National Bank of Fort Smith, Ark. v. Vanderboom, 422 F.2d 221 (8th Cir. 1970), and the Ninth Circuit, Ellis v. Carter, 291 F.2d 270 (9th Cir. 1961), the rule is that scienter is not required to maintain a private 10b–5 damage action. We have dealt with the issue under significantly different circumstances in Stevens v. Vowell, 343 F.2d 374 (10th Cir. 1965). But in Gilbert v. Nixon, 429 F.2d 348, 357 (10th Cir. 1970), we considered the identical issue in a case involving Section 12(2) and Rule 10b–5. The rule there articulated is applicable here. "One is not to be held liable * * * because of his misleading misrepresentation or omission

of material fact, the truth of the matter being unknown to the purchaser, if the party responsible for the misrepresentation or omission sustains the burden of proving that he did not know, and in the exercise of reasonable care could not have known that it was a misrepresentation or omission."

Two times during his opinion the trial judge recited: "[T]he record here discloses that the press release issued by defendants was misleading, intentionally deceptive, inaccurate and knowingly deficient in material facts." Reynolds v. Texas Gulf Sulphur Company, 309 F.Supp. at 562, 563–564. Confronted with the abundance of evidence in the record, we cannot conclude that TGS sustained its burden of proving that it did not know of the misrepresentation, nor was it demonstrated that with due diligence TGS could not have known of the faultiness of the statement.

The complainants have met the reliance requirement if "the misrepresentation is a substantial factor in determining the course of conduct which results in [the investors'] loss." List v. Fashion Park, Inc., 340 F.2d 457, 462 (2nd Cir. 1965); VI Loss, Ch. 11C at 3876–83. Appellants' argument on this point is two-fold: First, that the trial court's findings that each plaintiff-appellee relied on the April 12 release was clearly erroneous; and, second that as a matter of law, once the April 16 release was received by the brokerage houses over the Merrill Lynch and Dow-Jones wire services, curative information was available which should have corrected any erroneous notions in the minds of reasonable investors as to the Timmins project.

■ The trial court specifically found that each of the appellees herein relied upon the misleading and inaccurate announcement in making his decision to sell his TGS stock, and that none knew of the announcement of April 16 at the time of his sale. Reynolds v. Texas Gulf Sulphur Company, 309 F.Supp. at 559, 560, 561, 562. Appellants enumerate several factors which may have induced Reynolds to sell his TGS stock. A thorough search

of the record convinces us that although any one or all of the factors may have partially motivated the sale, the evidence is not so deficient as to make the finding of the trial court clearly erroneous that the principal reliance was on the April 12 statement.

The dispute over the Mitchell sale is that he timed his decision to sell on speculation as to what the market was going to do. Again, the evidence of record does not clearly refute the finding that the primary motivation was the deceptive April 12 release. The Stouts' case is more difficult due to the time lapse between the corrective April 16 release and the sell order—more than five days later. But even with that entanglement, we cannot, on the basis of clear error, conclude from the record that the April 12 release was not a substantial factor in the Stouts' decision to sell.

■ Greater difficulty is encountered with the second of appellants' two-pronged argument which directs itself to the issue of due diligence and good faith required of investors trading in the market. *See* City National Bank of Fort Smith, Ark. v. Vanderboom, supra. Reynolds traded within a reasonably brief time following the April 16 release and should not be denied his recovery. Mitchell is in exactly the same position with regard to the 400 shares which were sold by April 17. Both testified that they were attempting to reap the maximum profit before the "gloomy" release took its toll. We conclude that good faith and due diligence were exercised in the sale of these shares. On the other hand, although mala fides is not involved, the record will not support a claim of due diligence in the Stouts' sale and in Mitchell's late sale of the 20 shares.

At some point in time after the publication of a curative statement such as that of April 16, stockholders should no longer be able to claim reliance on the deceptive release, sell, and then sue for damages when the stock value continues to rise. This is but a requirement that stockholders too act in good faith and with due diligence in purchasing and sell-

ing stock. Although Mitchell alleges that he ordered the 20 shares sold on the 17th, there is no dispute that they were not in fact sold until the 23rd. His explanation is that somehow the sell order was not properly communicated until the 22nd when he called his broker to inquire into their status. In the Stouts' case, there was no miscommunication. They simply did not intend to sell until the 21st. While in some circumstances such delays may not be unreasonable, we conclude that under the circumstances of this case it would unjustifiably extend TGS liability to intolerable limits.

Between April 13 and April 22, TGS stock had increased in value from 30⅛ to a high of 47, with the volume of sales going from 126,500 to over 326,000. But most significant is the abundance of publicity given the April 16 statement during the following few days. The business news of every major news publication carried the story with bold headlines. Indeed, the 45 pages of press clippings and stock quotations in the record gives force to the proposition that the April 16 release received saturation coverage. We conclude that by Wednesday, April 22 when the Stouts sold their stock, and Thursday, April 23 when Mitchell sold the 20 shares, the reasonable investor would have become informed of the April 16 release and could no longer rely on the earlier release in selling TGS stock.

■ The final defense asserted by appellants is directed to the applicable statute of limitations. There is no statute of limitations contained in Section 10(b) of the Act. The settled rule is that when a federal statute is silent as to the statute of limitations, the appropriate period of limitation of the forum state is applied. International Union, United Automobile, etc., Workers, etc. v. Hoosier Cardinal Corporation, 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966). The trial court in this case looked to Utah law and applied 78–12–26(3), Utah Code Annotated, 1953: "Within three years: * * * (3) An action for relief on the ground of fraud

or mistake; but the cause of action in such case shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting fraud or mistake."

Appellants contest the applicability of this fraud statute of limitations upon the tenet that this is not a fraud case. It is apparent, we trust, from the earlier statements in this opinion supporting the findings of the trial court, that the central issues in private 10b–5 damage actions coalesce with "fraud or mistake". Moreover, in Chiodo v. General Waterworks Corporation, 380 F.2d 860 (10th Cir. 1967), it was held that the Utah statute of limitations pertaining to fraud controlled the filing of a complaint under Section 10(b) of the Act. Vanderboom v. Sexton, 422 F.2d 1233 (8th Cir. 1970), is principally distinguishable because that circuit has abrogated any semblance of scienter in a private 10b–5 damage action. Not having accomplished that same rationale in this circuit, we will here adhere to earlier decisions applying fraud statutes of limitations.

 Some doubt still remains, however, whether appellees met this period of limitations. Reynolds filed suit July 12, 1966. No complaint is raised as to the appropriateness of his action meeting the three-year limit. But Mitchell did not file until April 17, 1967, and appellants claim that since he knew of the April 16 release on the date of its issuance, he knew of the fraud on that same day and is thus not within the time limit for filing suit. Mitchell contended he did not know of the fraud until later. The matter rests on facts which the trial court found favorable to Mitchell, and we sustain that finding on an absence of clear error.

We pass now to the issue of damages. The trial court, in framing a rule for determining a proper award of damages, started with the proposition that the aim of courts in this situation is to restore claiming parties to the positions they would have enjoyed had they not been fraudulently induced to sell their stock. Proceeding to fashion a remedy which would make effective the Congressional purpose, J. I. Case Co. v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 12 L. Ed.2d 423 (1964), the trial court adopted a qualification of the rule announced in Galigher v. Jones, 129 U.S. 193, 201, 9 S.Ct. 335, 338, 32 L.Ed. 658 (1889): "[T]he true and just measure of damages in these cases is to be the intermediate value of the stock between the time of its conversion and a reasonable time after the owner has received notice of it to enable him to replace the stock." From this rule the trial court postulated the following measure of damages: " * * * this is an attempt to give a twenty trading day period within which the average of the highest daily prices is the measure of damages, and a period within which the shareholders received, or should have received, notice of the Texas Gulf Sulphur announcement of April 16." Reynolds v. Texas Gulf Sulphur Company, 309 F.Supp. at 563. With the lapse of twenty trading days it was felt that market reactions would more accurately reflect actual value and allow a reasonable time for the reasonable and diligent shareholder to learn of the April 16 announcement and protect his interest. The averaging aspect was inserted because the trial court felt it highly improbable that any of the appellees would have sold at the highest price.

All party litigants are dissatisfied with this measure of damages. Appellants contend that only actual damages based on market value as of April 16 are recoverable; that appellees have failed to prove such loss; and even accepting the lower court's measure, twenty days is too lengthy and thereby unreasonable. By cross-appeal, Mitchell and Reynolds request restitution or damages equivalent to restitution, and costs of conducting this action.

 We are in harmony with the rudiments of the trial court's measure of damages and alter that rule only to more closely adhere to the notion that the injured parties should be restored to their

former status. The divergent approaches taken by the litigants verify the suspicion that a set rule of damages has not been tested in this kind of case. Furthermore, because of the uniqueness of the litigation, it would be unwise to set forth a uniform rule with broad applications to all securities cases. Thus, the rule styled by this court is fashioned for these unprecedented circumstances.

Restitution and damages equivalent to restitution are inappropriate remedies in this action. Traditionally these theories have been concerned with direct-personal dealings in which there is privity and/or unjust enrichment upon which to justify the remedy. Speed v. Transamerica Corporation, 135 F.Supp. 176 (D.Del.1955), aff'd modifying interest 235 F.2d 369 (3rd Cir. 1956); Janigan v. Taylor, 344 F.2d 781 (1st Cir. 1965); Bromberg, § 9.1 at 225, et seq. Here neither element is present inasmuch as neither TGS nor Fogarty purchased appellees' shares of stock. The absence of those fundamental facts, plus the hardship it would visit upon TGS as a corporation,[13] makes this case inappropriate for any form of restitution, and the trial court properly rejected it.

We believe the measure of damages used should award the reasonable investor the amount it would have taken him to invest in the TGS market within a reasonable period of time after he became informed of the April 16 release. Through the testimony of both Reynolds and Mitchell we are satisfied, as was the trial court, that they possessed ample sophistication to fall within the nebulous reasonable investor category. By Monday, April 20, the diligent and reasonable investor was informed of the most recent TGS statement and as we earlier stated after that duration a reasonable investor would not have relied upon the April 12 statement in selling his TGS stock. After the reasonable stockholder had opportunity to apprise himself of the April 16 release and its import to investment, a reasonable time lapse may be allowed to expire to permit the investor to decide whether or not he would reinvest and take advantage of a spiraling market. If he has failed to reinvest, as both Reynolds and Mitchell did, he must suffer the consequences of his own judgment. The award proposed would permit one to "cover" by reinvestment and suffer neither loss nor forced sale.

The damages then should be based on the highest value of TGS stock between Monday, April 20 and a reasonable time thereafter. Whether we conclude such duration should be an added nine trading days (through Friday, May 1) which seems more reasonable in these circumstances, or the seventeen additional trading days imposed by the trial court (through Wednesday, May 13) is irrelevant to the award. For in either event, the highest value was achieved on Wednesday, April 29 (at $59) prior to the expiration of either time limit.

The averaging aspect is deleted to conform with what is considered the focal purpose: to award the reasonable investor an amount which offsets any loss he suffered by a deceitfully induced sale. To award an average price would not fully compensate him for a number

13. In their appellate brief, appellants claim that if the measure of damages theory applied in the trial court is upheld on appeal, damages will approach $14,000,000. In Ruder, Texas Gulf Sulphur—The Second Round, 63 Nw.U.L.Rev. 423, 428–29 (1969), restitution damages are computed: " * * * if liability is imposed upon TGS in the private suits for the company's failure to disclose the material inside information which it possessed, its damages may be equal to $130 for every share traded during the period from November 12, 1963, through April 16, 1964. Since approximately 3 million TGS shares were traded during this period, damages would amount to over 390 million dollars, approximately 150 million dollars more than the present net worth of the company. If liability is imposed upon TGS only for the period from April 12, 1964, * * * until April 16, 1964, * * * the company could incur damages of about 84 million dollars, since approximately 691,-000 shares were traded during that four day period." [Footnotes omitted]

of the days within the reasonable period following the last release. While this is an admitted compromise between the restitution rule and the actual damage approach as taken by TGS, it seems a fair way to reinstate stockholders who were wrongfully deprived of their gain because of the deceitful release and, at the same time, deny recovery to those who suffered only by their own lack of due diligence. In selecting the highest daily price the advantage works, to a greater degree, against TGS. But where, as here, the injury is suffered by an act making difficult the exact computation of damages, the wrongdoer is not heard to complain. For "it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts." Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931).

In their cross-appeal, Reynolds and Mitchell also argue in favor of awarding attorneys' fees. We are cited to our decisions in Esplin v. Hirschi, 402 F.2d 94 (10th Cir. 1968), cert. den'd 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969), and Estate Counseling Service, Inc. v. Merrill Lynch, Pierce, Fenner and Smith, 303 F.2d 527 (10th Cir. 1962). It is contended that both decisions stand for the proposition that the policy in the federal courts is to award the costs of conducting the action in securities cases. Although in both cases we allowed recovery of "other outlay legitimately attributable to the defendant's fraudulent conduct," it was not intended to include the costs of bringing the action. This is seen in the Estate Counseling Service case where a defrauded buyer brought the appeal but was not awarded attorney fees as "other outlay legitimately attributable to the defendant's fraudulent conduct." Attorneys' fees are denied.

The damages awarded to Reynolds amount to $12,687.50; Mitchell's damages are fixed at $7,600.00. The decisions by the trial court that both appellees are to receive interest computed at six per cent per annum from the time of sale until the date of the trial court's judgment, and that when recovery is gained from TGS, appellees' claims against Fogarty will be deemed paid, satisfied and discharged, are not disturbed.

Fogarty asserts on his own behalf that the trial court lacked personal jurisdiction over him. Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, provides that "[t]he district courts of the United States * * * shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce liability or duty created by this chapter or the rules and regulations thereunder. * * * *" The remainder of that statute provides for service of process, allows for review of judgments and decrees, and designates proper venue. The latter provision relates back to the jurisdictional portion, and allows such actions to be brought in any district where the defendant is found or is an inhabitant or transacts business.

The brunt of Fogarty's allegations is directed at venue—not jurisdiction. His main claim is that he has never been an inhabitant of Utah, was not found in Utah, and transacts no business in that state. That was the identical issue posed to this court in Texas Gulf Sulphur Company v. Ritter, 371 F.2d 145, 148–149 (10th Cir. 1967), wherein we said: "venue as to both defendants will lie in the Utah District if any of the acts or transactions complained of took place in that district." The acts and transactions complained of which have now been proved were "publication of news releases and acts incident to the sale of the stock referred to herein * * * the release of a false and fraudulent press release, upon which he [Reynolds] relied after reading the same in the Wall Street Journal in Salt Lake City, which newspaper had been transmitted to him through the United States mails. In addition the plaintiff contends this press release came to Salt Lake City on the Dow-Jones broad tape." Thus the issue has been decided against Fogarty and is not now open to relitigation.

The only issue left to be decided is raised individually by Reynolds and concerns whether Rule 23 F.R.Civ.P., 28 U.S.C., should be applied to afford relief to all persons who sold TGS stock between April 12 and April 16, 1964. A number of independent inquiries are included in this argument, e. g., may an appellate court correct a class ruling after a decision on the merits; and may parallel class actions be conducted in two jurisdictions? But ignoring all collateral issues, as cross-appellant has invited us to do, the only issue is whether the trial court properly exercised its discretionary powers.

Rule 23(a) recites four prerequisites to a class action. Assuming, arguendo, that the elements of (a) have been met, it appears that the trial court was convinced that a class action in Utah would not conform to (b) (3) of Rule 23. That subsection requires, inter alia, that the class action be "superior to other available methods for the fair and efficient adjudication of the controversy." The Rule outlines four nonexhaustive matters which are to be considered in deciding the superiority of a class action: "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action." In an opinion reported at 309 F. Supp. 566 (D.Utah 1970), the trial court denied the motion for a class action, basing the decision on Rule 23(b) (3) (B), (C) and (D).

The trial judge recited that as of October 22, 1969, ninety-four actions had been brought against TGS and individual defendants; that in March, 1969, two actions in the Southern District of New York had been allowed to proceed as class actions; that pursuant to that ruling, tedious and time consuming discovery had taken place; and that if the various private suits were concentrated for trial in a single district, it should be in the Southern District of New York. In summary, he stated: "The litigation in New York is far advanced, far and away the bulk of the cases are there, and the information necessarily to be obtained from the brokerage offices is more readily and more conveniently available in New York City." Reynolds v. Texas Gulf Sulphur Company, 309 F.Supp. at 570. Our conclusion is that the trial court has wisely exercised its discretion.

In No. 280–70, the judgment is affirmed in all respects except as to the untimely sale of the 20 shares and as to the issue of damages. In No. 282–70, the judgment is affirmed in all respects except as to the issue of damages. Accordingly, No. 280–70 is remanded with directions to enter judgment for Mitchell for $7,600.00; and No. 282–70 is remanded with directions to enter judgment for Reynolds for $12,687.50. In No. 284–70, the judgment is reversed and the case is remanded with directions to enter judgment in favor of Texas Gulf Sulphur Company, et al. The cross-appeals in Nos. 281–70, 283–70 and 285–70, are denied.