**Brian Atwood WANSOR,
Plaintiff-Appellant,**

v.

**GEORGE HANTSCHO CO., INC.,
Defendant-Appellee,**

v.

**W. R. BEAN & SON, INC., Third-Party
Defendant-Appellee.**

**No. 75–3093.**

United States Court of Appeals,
Fifth Circuit.

March 24, 1978.

As Amended on Denial of Rehearing
and Rehearing En Banc
May 24, 1978.

Cullen M. Ward, W. Davis Hewitt, Jackson C. Floyd, Jr., Atlanta, Ga., for plaintiff-appellant.

N. Forrest Montet, Atlanta, Ga., for defendant-appellee.

T. Cullen Gilliland, Atlanta, Ga., for other interested parties.

Before BROWN, Chief Judge, COLEMAN and MORGAN, Circuit Judges.

JOHN R. BROWN, Chief Judge:

In this products liability action, Brian A. Wansor seeks damages for injuries he sustained while working on a printing press owned by his employer, W. R. Bean & Son, Inc. (Bean). Wansor sued the manufacturer of the press, the George Hantscho Company, Inc. (Hantscho), alleging negligence and breach of implied warranties. At the close of the plaintiff's case, the District Court granted Hantscho's motion for a directed verdict and this appeal followed. We hold that the appeal is timely but do not now reach either the propriety of the grant of the directed verdict or the merits of Wansor's claim. Because the issues are controlled by important questions of Georgia law, we certify the case to the Georgia Supreme Court to determine whether the state's rules governing strict liability allow the recovery sought.

### The Turning Of The Screw

On the date Wansor was injured, August 10, 1971, he had been working for Bean, a magazine printing firm, for approximately three weeks. Wansor's job as a jogboy, or journeyman, the lowest position in this shop, required him to see that webb paper coming out of the multi-unit printing press as finished product was stacked and bundled for shipment and delivery. Although Wansor did not actually operate the machinery, he had helped three or four times in cleaning the press after a printing run to remove the ink residue. Wansor was injured during this wash-up process.

After each run, the press was stopped, pans placed under the rollers, and the press turned on so that all six units were idling. Each crew member, armed with a bottle filled with naptha, a cleaning solvent, then stood on a catwalk running around each unit and into the machine and squirted naptha on the unguarded, revolving rollers. Some of the naptha, mixed with ink, would be thrown back onto the catwalks as the rollers turned. Most of the ink and solvent would drip onto the lowest rollers and into the pans. The lower roller was cleaned by a blade that scraped off the accumulating residue. This blade was adjusted before and during the process to ensure that all the residue was removed. Wansor's injuries occurred while he was making this adjustment, the first time he had performed this task while the machine was in operation.

To adjust the scraper blade, Wansor had to crouch on the catwalk to avoid being hit by the rollers above him, turn two screws located about fifty inches apart, then back out in the same Russian-folk-dance crouched walk. On the date involved here, Wansor had finished adjusting the screws and was beginning to back out of the machine when he slipped on the now oily catwalk. In the fall, Wansor's right hand became caught in the unguarded rollers. He attempted to pull his hand out but succeeded only in entangling his left hand as well and in the struggle caught his hair on the upper rollers. Although the machine was quickly turned off, Wansor's hands were severely mangled. Despite extensive medical treatment, he lost most of the fingers and part of the thumb from his right hand and two fingers from his left hand.

Plaintiff Wansor contended that Hantscho was negligent in the manufacture, design, construction, installation, and assembly of the press.[1] Wansor specifically pointed to the lack of guards for the rollers; the placement of the adjustment screws for the scraper blade inside the machine frame next to the rotating equipment; the placement of the catwalk between the units of the machine, requiring a workman to assume a crouched position to reach the adjustment screws; the lack of a device to prevent the catwalk from becoming slick with ink and naptha thrown from the rollers; and the design that permitted the scraper blade to be adjusted while the ma-

---

1. Wansor had collected Workmen's Compensation payments from his employer and did not name Bean in the suit. Hantscho brought a third-party action against Bean, claiming that Bean was negligent in not stopping the machine when the scraper blade required adjustment during the cleaning process.

chine was in operation. Asserting that these aspects of the machine's construction and operation rendered it inherently dangerous, plaintiff also claimed that Hantscho was negligent in failing to warn of such dangers. Finally, Wansor claimed that the machine was defective, in breach of the implied warranties of merchantability and intended use that are statutorily imposed on manufacturers under Georgia Code Ann. § 105–106.[2]

At the close of the plaintiff's case, during which experts testified as to the applicable standards of safety in design, manufacture, and operation, the District Judge directed a verdict for the defendant Hantscho. The Judge based his verdict partially on the so-called state of the art defense, stating that "[a] critical test [for negligence] . . is what the manufacturer knew at the time the equipment was manufactured and what was common practice within the industry at the time," and partially on a finding that the dangers of the machine were open and obvious, thus relieving the manufacturer of a duty to protect or warn the plaintiff.

On this appeal, Wansor urges us to hold that by granting the directed verdict, the District Judge erroneously took the case from the jury when questions remained that belonged to the jury as a matter of law. In particular, Wansor points to the fact that the Judge directed the verdict on March 20, 1975, the day on which the Georgia Court of Appeals handed down the decision clarifying the applicability of strict liability in the state.[3] Wansor asserts that the District Judge erred in refusing to submit questions arising under this doctrine to the jury.

### Have We An Appeal?

Before we can begin to discuss the merits of Wansor's contentions, we must address Hantscho's claim that the appeal is untimely and must therefore be dismissed. Hantscho bases this argument on F.R.A.P. 4(a),[4]

---

2. The statute, amended in 1968 to add the second sentence, the language relevant here, provides:

> **105–106.** (4408) **Privity to support action.** —No privity is necessary to support an action for a tort; but if the tort results from the violation of a duty, itself the consequence of a contract, the right of action is confined to the parties and privies to that contract, except in cases where the party would have had a right of action for the injury done, independently of the contract, and except as provided in Code section 109A–2—318. However, the manufacturer of any personal property sold as new property, either directly or through a dealer or any other person, shall be liable in tort, irrespective of privity, to any natural person who may use, consume or reasonably be affected by the property and who suffers injury to his person or property because the property when sold by the manufacturer was not merchantable and reasonably suited to the use intended and its condition when sold is the proximate cause of the injury sustained; a manufacturer may not exclude or limit the operation hereof.

3. *Parzini v. Center Chemical Co.*, 1975, 134 Ga.App. 414, 214 S.E.2d 700.

4. F.R.A.P. 4(a) provides, in relevant part:
> **(a) Appeals in Civil Cases.** In a civil case . . . in which an appeal is permitted by law as of right from a district court to a court of appeals the notice of appeal required by Rule 3 shall be filed with the clerk of the district court within 30 days of the date of the entry of the judgment or order appealed from . . . . .
>
> The running of the time for filing a notice of appeal is terminated as to all parties by a timely motion filed in the district court by any party pursuant to the Federal Rules of Civil Procedure hereafter enumerated in this sentence, and the full time for appeal fixed by this subdivision commences to run and is to be computed from the entry of any of the following orders made upon a timely motion under such rules: (1) granting or denying a motion for judgment under Rule 50(b); (2) granting or denying a motion under Rule 52(b) to amend or make additional findings of fact, whether or not an alteration of the judgment would be required if the motion is granted; (3) granting or denying a motion under Rule 59 to alter or amend the judgment; (4) denying a motion for a new trial under Rule 59. A judgment or order is entered within the meaning of this subdivision when it is entered in the civil docket.
>
> Upon a showing of excusable neglect, the district court may extend the time for filing the notice of appeal by any party for a period not to exceed 30 days from the expiration of the time otherwise prescribed by this subdivision. Such an extension may be granted before or after the time otherwise prescribed by this subdivision has expired; but if a request for an extension is made after such time has expired, it shall be made by motion with such notice as the court shall deem appropriate.

which requires that a timely notice of appeal must be filed "within 30 days of the date of the entry of the . . . order appealed from . . . ." This 30-day period is tolled by a timely motion for judgment under F.R.Civ.P. 50(b); for an altered or amended judgment under F.R.Civ.P. 59; or for a new trial under F.R.Civ.P. 59. The time for appeal begins to run again when the judge grants or denies one of these motions. If an appeal is not filed within 30 days after such an order is entered, the judge may extend the time upon a showing that the failure to file a timely appeal was the result of excusable neglect.

The District Court directed a verdict for Hantscho on March 20, 1975. The running of the 30-day period for appeal was tolled on March 28, when Wansor filed motions for a new trial, for judgment notwithstanding the verdict, and to set aside the judgment. On June 4, 1975, the District Court denied these motions, and the 30-day period began to run anew, ending no later than July 7, 1975. On this date, Wansor had not filed an appeal. However, on June 13, he filed a motion asking the District Court Judge to reconsider the June 4 order denying plaintiff's previous motions. The Judge denied this motion on July 22, and Wansor filed a notice of appeal on July 24, after obtaining an order extending the time for appeal.

■ The District Court Judge found that Wansor's delay resulted from a belief that the motion to reconsider filed on June 13 was among the motions that toll the period for filing an appeal. This belief is mistak-

en. A motion to reconsider an order disposing of a motion of the kind enumerated in Rule 4(a) does not again terminate the running of the time for appeal.[5] *Ellis v. Richardson,* 5 Cir., 1973, 471 F.2d 720; 9 Moore's Federal Practice ¶ 73.09[4], at 3186. The District Court Judge found that the cause of the delay, counsel's misunderstanding of the effect of the June 13 motion, constituted excusable neglect. Hantscho challenges this finding, claiming that the District Court misapplied the standard for excusable neglect that will justify an untimely appeal under Rule 4(a).[6] A panel of this Court has already denied a motion by Hantscho to dismiss the appeal. On the full record, we affirm this earlier order.

■ A brief look at the history of Rule 4(a) and the excusable neglect rule leads us to conclude that the District Court's finding and the prior ruling of this Court cannot be reversed. Until 1946, the civil rules permitted no extension of the time for appeal. Prior to 1966, a party could obtain an extension of the time for filing a notice of appeal in a civil case only by showing that he had failed to learn of the entry of the judgment, F.R.Civ.P. 73(a).[7] The 1966 amendment omitted this restriction, providing instead that the District Court had the power to extend the time for appeal "upon a showing of excusable neglect." The Advisory Committee Notes to the 1966 amendment to former Rule 73(a) do not indicate what grounds besides failure to learn of the entry of judgment will constitute excusable neglect. The Notes did emphasize that the

---

**5.** If this were a motion to reconsider the original judgment, it would function as a motion for new trial or judgment notwithstanding the verdict, and would toll the running of the period for appeal if timely filed—within 10 days after the judgment. Because this motion was filed almost 3 months after the original judgment, it obviously would not be timely.

**6.** Hantscho also claimed that the Judge ignored Rule 4(a)'s requirement that a request for an extension made after the time for appeal has expired must be made by written motion, with prior notice to the nonmoving party and a hearing on the issue of excusable neglect. Wansor contests this description of the procedures followed in securing the order extending the time for appeal, claiming that the order was made

by motion and did not issue ex parte. Wansor also emphasizes that the notice to the nonmoving party required by the rule is "such notice as the court shall deem appropriate." Given the conflicting facts before us and the open terms of the rule, we see no basis for dismissing the appeal on the grounds of insufficient notice or improper procedures followed in the issuance of the order.

**7.** E. g., *Watson v. Providence Washington Insurance Co.,* 4 Cir., 1953, 201 F.2d 736. Until the 1966 amendments, no extensions were permitted in criminal cases for any reason. E. g., *United States v. Robinson,* 1960, 361 U.S. 220, 80 S.Ct. 282, 4 L.Ed.2d 259.

District Court has discretion to grant extensions of time, a discretion based in the need for action in cases "where injustice would otherwise result." In the present case, the District Court exercised this discretion and found that counsel's error was excusable neglect. We are unable to say that this finding is a clear abuse of the discretion granted by the rule, and therefore decline to dismiss the appeal.

We do not hold that a bona fide misunderstanding or mistake as to the law by counsel will constitute excusable neglect. We recognize that such a proposition would make the requirement of timely filing almost undeterminable. See *Airline Pilots in the Service of Executive Airlines, Inc. v. Executive Airlines, Inc.*, 1 Cir., 1978, 569 F.2d 1174, 1175; 9 Moore's Federal Practice, ¶ 204.13[1], at 967–74, for explanations of the excusable neglect requirement and examples of the most frequently accepted excuses. All we decide here is that, viewing the facts and circumstances as a whole, the District Court Judge did not abuse his discretion in granting an extended time for appeal.

### Directed Verdict

■ The propriety of a District Court's grant of a directed verdict is measured by the standard set by this Court in *Boeing Company v. Shipman*, 5 Cir., 1969, 411 F.2d 365, 374 (en banc):

> If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury.

On appeal, the Court is to view all the evidence with all reasonable inferences most favorable to the nonmoving party. *Worthington Corp. v. Consolidated Aluminum Corp.*, 5 Cir., 1976, 544 F.2d 227, 230; *Callon Petroleum Co. v. Big Chief Drilling Co.*, 5 Cir., 1977, 548 F.2d 1174, 1176.

Wansor had been working at Bean for approximately three weeks when he was injured. While he had previously participated in the general clean-up operation, he had never before adjusted the screws during the process. Wansor presented evidence showing that during the cleaning procedure, naptha would splash on the catwalk and leave it slippery, and that one had to adjust the screw while crouching on this slippery catwalk and exit by backing out in the same crouched position. There was testimony that Hantscho knew that Bean ordinarily kept the machine running during the clean-up operation as a means of minimizing the "down time" involved.

■ In most cases, we would find it a relatively straightforward matter to apply the law governing directed verdicts to such facts as these. This case, however, is complicated by its diversity origins. Whether a directed verdict was properly granted—a question of federal law—turns on the outcome of the state law questions that are to be submitted to the Supreme Court of Georgia for resolution. The critical question to be submitted, and the basis for our certification of this case, is whether the Georgia doctrine of strict liability, based as it is on language enacted in 1968 and interpreted decisively in 1975, applies retroactively. If the Georgia Court holds that the statutory basis for strict liability does not apply to machinery installed in 1961, plaintiff's assertion that the directed verdict improperly took questions arising under the doctrine from the jury would fail. If, on the other hand, Georgia rules that § 105–106 allows recovery for injuries occurring in 1971, then the ingredients of a strict liability claim would be appropriate for jury resolution.

Until the retroactivity question is answered, any efforts on our part to measure the propriety of the directed verdict would be premature. We therefore defer the resolution of this issue until Georgia returns the case to us pursuant to the procedure of certification.

### Strict Liability In Georgia

■ Hantscho first contends that strict liability is not at issue in this case because it was not pleaded in the court below. We cannot agree with this proposition. While it is true that neither the complaint nor the pretrial order used the magic words "strict liability," the suit was in part based on Georgia Code Ann. § 105–106, set forth at note 2, *supra*. It is understandable that counsel in drafting the complaint did not explicitly refer to strict liability: § 105–106 had not yet been interpreted by the Georgia Court of Appeals at the time the case was filed. However, prior to the trial the Georgia Supreme Court did say that § 105–106 imposes a degree of strict liability upon manufacturers. *Ellis v. Rich's Inc.*, 1975, 233 Ga. 573, 212 S.E.2d 373.[8] The Federal Rules of Civil Procedure demand a liberal construction of pleadings, requiring only that they give fair notice of what the evidence is expected to show. Hantscho does not claim surprise or inability to prepare a defense to the issue of strict liability. The only contention is that strict liability was not explicitly raised by the complaint or pretrial order. This attack is answered by F.R.Civ.P. 15(b), which provides:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.

The record reveals that with respect to the facts that might give rise to strict liability, the case was tried without objection. Rule 15(b) does not lose its vitality because, in addition to the facts introduced without objection, the pleader failed to include a tag identifying the reasons giving such facts their legal significance. As evidence of the presence of the contention below, we point out the trial judge's statements that the holding in *Ellis* was dicta and that he did not believe that the Georgia courts would interpret the Georgia statute to apply retroactively. It is to this question that we now turn.

Hantscho manufactured this printing press in 1960 and installed it at Bean in 1961. The statutory basis for the strict liability claim, Georgia Code Ann. § 105–106, was not amended until 1968 to overcome privity limitations on tort recoveries, and was not decisively interpreted to incorporate strict liability until 1975. Does the Georgia doctrine of strict liability apply retroactively to products manufactured prior to 1975? Prior to 1968? As early as the date of installation, 1961? The date of manufacture, 1960?

■ To resolve the issues for all the parties and to insure stare decisis effect for our opinion, we certify this case to the Georgia Supreme Court for a resolution of this and other state law questions.[9]

■ Because we are certifying the case, we do not here decide Hantscho's contention that no recovery can be had because Wansor showed no defect. We agree with the general proposition that a defect is required for a successful claim of strict liability, but do not decide here whether the machine, which unquestionably functioned flawlessly as a printing press, was nonetheless rendered defective by Hantscho's fail-

---

**8.** Indeed, as indicated above, the *Parzini* case was before the Georgia courts at the time this case was tried below. In *Parzini*, a claim for injuries sustained when highly caustic drain solvent squirted onto the plaintiff from a bottle manufactured by the defendant, the Superior Court had entered judgment on a verdict for the manufacturer. On March 20, 1975, the Court of Appeals reversed, upholding the statement in *Ellis v. Rich's, Inc.*, 233 Ga. 573, 212 S.E.2d 373, that § 105–106 " 'does impose a degree of strict liability upon manufacturers,' " *Parzini v. Center Chemical Co.*, 134 Ga.App. 414, 214 S.E.2d 700, at 702, and clarifying the bases of liability. Wansor made the trial judge aware that a decision was imminent from the Georgia Court of Appeals, whose holdings are binding throughout the state and on us as we sit for Georgia in a diversity case. The trial judge nonetheless directed a verdict for Hantscho on the same day that the *Parzini* opinion was handed down by the Georgia court.

**9.** Certification to the Georgia Supreme Court is possible under Ga.Code Ann. § 24–3902, as amended in 1977. For our first use of this important state statutory aid to federal courts, see *In re McClintock*, 5 Cir., 1977, 558 F.2d 732, on certification 241 S.E.2d 831, Ga., 1978.

See Brown, *Certification—Federalism in Action,* 7 Cumberland L.R. 455 (1977), for a description of the development of this important device of federalism.

ure to protect or warn against the dangers posed by the unguarded rollers. This question will become decisive only if the doctrine of strict liability applies to the case, the question we have directed to the Georgia Supreme Court. For the same reason, we decline to reach Hantscho's alternative contention that, assuming the machine to be defective, because the danger of becoming caught in the rollers was open and obvious, and because Wansor's testimony indicated he knew of the hazards involved, no liability can be predicated on § 105–106. Our review of Georgia law indicates that an obvious danger, known to the plaintiff, precludes recovery under strict liability only if "his use of the product in view of this knowledge was unreasonable," *Parzini v. Center Chemical Co.*, 1975, 136 Ga.App. 396, 221 S.E.2d 475.[10] This question must also await the completion of the certification process.

As is our practice, by directive from the Clerk, we now ask counsel to assist us in drafting the facts and issues to be certified.[11] Of course, we do not intend the statement of the issues to inhibit Georgia in framing its answer and we welcome answers as well as to corollary questions thought to be significant.[12]

On receipt of counsels' proposed statement of the facts and issues to be certified, we will issue the formal certification transmitting the entire record in this case, the Court's opinion, and all the papers and briefs to the Georgia Supreme Court.

Certified to the Supreme Court of Georgia.

---

**10.** Wansor urges that the Georgia courts would follow others jurisdictions that have allowed recovery under strict liability for injuries that are open, obvious, and known to the plaintiff, without an inquiry into whether his use of the product was reasonable e. g., *Micallef v. Miehle Co.*, 1976, 39 N.Y.2d 376, 384 N.Y.S.2d 115, 348 N.E.2d 571, overruling New York's "patent danger rule" of *Campo v. Scofield*, 1950, 301 N.Y. 468, 95 N.E.2d 802; *Pike v. Frank G. Hough Co.*, 1970, 2 Cal.3d 465, 85 Cal.Rptr. 629, 467 P.2d 229. We do not see sufficient uncertainty in Georgia law on this point to warrant its inclusion as a question to be submitted in the certification. However, we do not intend to restrict the Georgia Court's response, and would welcome correction of our understanding of this point.

**11.** We invariably require this assistance from counsel in certified cases. See, e. g., *Allen v. Estate of Carman*, 5 Cir., 1971, 446 F.2d 1276; *Boyd v. Bowman*, 5 Cir., 1971, 443 F.2d 848.

**12.** As we have often stated before, e. g., *Martinez v. Rodriquez*, 5 Cir., 1968, 394 F.2d 156, 159 n. 6:

[w]e emphasize . . . that the particular phrasing used in the certified question is not to restrict the Supreme Court's consideration of the problems involved and the issues as the Supreme Court perceives them to be in its analysis of the record certified in this case. This latitude extends to the Supreme Court's restatement of the issue or issues and the manner in which the answers are to be given, whether as a comprehensive whole or in subordinate or even contingent parts.