S. John CHIPSER, Plaintiff-Appellant,

v.

KOHLMEYER & CO., a partnership, and Thomson & McKinnon Auchincloss Kohlmeyer, Inc., a corporation, Defendants-Appellees.

No. 76–4116.

United States Court of Appeals, Fifth Circuit.

July 20, 1979.

Ernest L. Potter, Jr., Huntsville, Ala., for plaintiff-appellant.

E. Cutter Hughes, Jr., Huntsville, Ala., for defendants-appellees.

Before RONEY, TJOFLAT and HILL, Circuit Judges.

TJOFLAT, Circuit Judge:

The plaintiff in this action is a speculator in commodities who alleges that the defendant, a brokerage partnership, improperly handled his account. He appeals from the entry against him of a judgment notwithstanding the verdict and the alternative grant of a new trial. We reverse the judgment n. o. v. and send the case back to be tried again. Before reaching the merits, however, we must confirm that we have jurisdiction over this appeal.

I

The jury returned a verdict for the plaintiff, John Chipser. The defendant, Kohlmeyer & Co.,[1] moved alternatively for judgment n. o. v. and a new trial. On August 25, 1976, the trial judge ruled:

> Accordingly, it is ORDERED, ADJUDGED and DECREED that the defendant's motion for judgment notwithstanding the verdict be and the same hereby is granted and judgment is entered for the defendant.
>
> It is further ORDERED that the defendant's motion for a new trial be and the same hereby is granted and the judgment heretofore entered herein for the plaintiff is set aside.

Record, vol. 1, at 27.

On September 3, 1976, Chipser's counsel wrote to the trial judge, "I have received

---

1. The original complaint also named as a defendant Thomson & McKinnon Auchincloss Kohlmeyer, Inc., a corporation into which Kohlmeyer & Co. merged after the events giving rise to this suit but before the filing of the complaint. The complaint was dismissed for lack of in personam jurisdiction with leave to refile. Service was never subsequently made on the corporation, leaving Kohlmeyer & Co. the only defendant at trial.

your order in the above case granting the defendant's motion for new trial, and I would appreciate your advising when the case may be re-set for trial." *Id.* at 32. Three days later the judge wrote back, "The case has been reassigned to Judge Lynne. Judge Lynne would like for you to contact him while he is in Decatur for pre-trials commencing October 6, 1976 to discuss a new trial date." *Id.* at 31. On October 12, 1976, after the thirty-day period for filing a notice of appeal had expired, the court sua sponte amended its order of August 25, 1976, to make it clear that the grant of a new trial was alternative and would take effect only if the judgment n. o. v. were reversed on appeal. Chipser's motion for extension of time in which to appeal, which alleged the foregoing facts as excusable neglect, was filed October 15, 1976, and granted the same day.

■■ We review extensions of time under Fed.R.App.P. 4(a) for abuse of discretion. *See Wansor v. George Hantscho Co.,* 570 F.2d 1202, 1206–07 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 350, 58 L.Ed.2d 344 (1978); *Lowry v. Long Island Rail Road,* 370 F.2d 911,.912 (2d Cir. 1966); 16 C. Wright, A. Miller, E. Cooper & E. Gressman, *Federal Practice & Procedure* § 3950, at 367 (1977). The "excusable neglect" standard of that rule is intended to be a "strict one." Stern, *Changes in the Federal Appellate Rules,* 41 F.R.D. 297, 298–99 (1967). Failure to learn of the entry of judgment is the major, but not the only, reason for finding excusable neglect. *Dugan v. Missouri Neon & Plastic Advertising Co.,* 472 F.2d 944, 948 (8th Cir. 1973). A showing of other unique circumstances may render it unfair to dismiss an appeal because of late filing of the notice. *See Thompson v. Immigration & Naturalization Service,* 375 U.S. 384, 387, 84 S.Ct. 397, 399, 11 L.Ed.2d 404 (1964) (per curiam); *Harris Truck Lines, Inc. v. Cherry Meat Packers, Inc.,* 371 U.S. 215, 217, 83 S.Ct. 283, 285, 9 L.Ed.2d 261 (1962).

■ Here, the initial order of August 25, 1976, was at least somewhat confusing and prompted counsel's inquiry as to when a new trial date would be set. The confusion was compounded by the judge's response, which implied that a new trial had been granted without qualification. That the order was alternative was not made explicit until after time for appeal had expired. While counsel's initial misapprehension of the import of the August 25 order might not alone rise to the level of excusable neglect, *see Wansor v. George Hantscho Co.,* 570 F.2d at 1207; *Spound v. Mohasco Industries, Inc.,* 534 F.2d 404, 411 (1st Cir.), *cert. denied,* 429 U.S. 886, 97 S.Ct. 238, 50 L.Ed.2d 167 (1976) ("mere palpable mistake by experienced counsel" is not excusable neglect), we cannot say that an extension of time is unwarranted when counsel is misled by good faith reliance on a statement of the district court. The circumstances of this case are sufficiently unique to justify a finding of excusable neglect. *Cf. Thompson v. Immigration & Naturalization Service* (court's assurance to counsel that post judgment motions were timely when in fact they were not was unique circumstance justifying allowance of untimely appeal). The appeal is thus properly before us.[2]

## II

### A

The essential facts in this case are not in dispute. In August 1971 Chipser opened a commodities trading account with Kohlmeyer in Huntsville, Alabama. At that time he signed a Commodity Account Agreement that provided, in part, that all transactions for the account would be subject to the rules, regulations, customs and usages of the exchange or market where executed. The contract also provided that whenever Kohlmeyer considered it neces-

---

**2.** We note that effective August 1, 1979, the Supreme Court has amended rule 4(a) to provide that time for appeal may be extended "upon a showing of excusable neglect *or good cause.*" Fed.R.App.P. 4(a)(5) (May 1, 1979)

(amendment emphasized). The amendment does not apply to this case, but it indicates to us that flexibility is intended in the granting of extensions.

sary for its protection it had the right to close out and liquidate any and all of Chipser's outstanding contracts without notice or demand of any kind. Chipser also executed an authorization for Kohlmeyer to transfer funds from his commodity account to his stock accounts to avoid margin calls. He made several successful commodity speculations through Kohlmeyer without incident until 1973.

In early May 1973, on the advice of his broker at Kohlmeyer, Chipser purchased ten wheat spread contracts, July/December.[3] He deposited with Kohlmeyer the required margin of $100 per contract. Chipser was knowledgeable as to the workings of the commodities markets and computed the spread on the wheat contracts daily. Whenever he left town he left word with his broker where he could be reached.

In the period of May and June 1973 the wheat market was quite volatile. For the four days prior to June 1, 1973, prices moved the limit,[4] although the spread on Chipser's contracts remained fairly constant at between 3 and 4 cents, July over December. On June 1, a Friday, the spread increased dramatically, and Kohlmeyer liquidated five of the wheat spreads without notice or demand for margin. Chipser's account was charged with a $3,500 loss for the transaction. On Monday morning, June 4, Chipser received a call from his broker

demanding $5,000 additional margin on his ten wheat spread contracts.[5] Chipser had only $3,000 in his checking account and could not come up with the additional cash right away.[6] Consequently, his five remaining contracts were liquidated and the $2,842.50 loss charged to his account.

When Chipser checked his mail on the evening of June 4 he found a confirmation notice from Kohlmeyer regarding the sale of the five wheat spreads on June 1. This was his first notice that these contracts had been closed out before the margin call he had received that morning. He called his broker the next day and was told that the broker knew nothing about the June 1 sale and would check into it. Chipser neither bought back into the market nor requested that his wheat contracts be reinstated. He subsequently paid $1,000 to Kohlmeyer to cover the excess of his loss on the wheat spreads over the equity in his commodity account.

### B

The errors in this case derive in large measure from the inartfulness of the pleadings and the failure of the parties to define the issues or the theories of recovery and the measure of damages for each. The complaint alleged that Chipser and Kohlmeyer had a customer-broker relationship

---

**3.** A spread or straddle contract comprises offsetting long and short positions in commodities futures. In this case Chipser sold July wheat short and bought December wheat long. Each contract was for 5,000 bushels, for a total of 50,000. The profit or loss on the spread is measured by the difference in selling price between July and December wheat. Each penny per bushel that December wheat traded over July represented a $500 paper profit for all 10 contracts. If July wheat sold for a penny a bushel more than December wheat, that was equivalent to a $500 paper loss.

**4.** Rules of the Chicago Board of Trade (C.B.O.T.), where commodity futures are traded, restrict the movement of wheat prices on any one trading day to 10¢ per bushel up or down from the previous closing price.

**5.** The broker either did not know or intentionally did not inform Chipser that five of his contracts had already been closed out. In either event, Chipser testified that the margin call

was for $500 per contract and that the broker said that the C.B.O.T. had made the increase. Chipser contends this was a fraudulent misrepresentation since Kohlmeyer, not the C.B.O.T., had ordered the increase in margin and the margin call should have been for five instead of ten contracts.

**6.** Prior to June 1, 1973, Kohlmeyer had transferred $3,325 from Chipser's commodity account to his stock accounts. Chipser contends these transfers were in breach of the written authorization he had given Kohlmeyer because they were not for the purpose of avoiding margin calls on the stock accounts. He asserts that if they had not been made, he would have been able to meet the margin call on his commodity contracts. Kohlmeyer contends the transfers were authorized and that the funds were taken into account in making the margin call on the wheat spreads.

but set forth only a part of their dealings: the purchase of the wheat spreads, the inter-account transfers, the demand for additional margin, and the liquidations. The complaint made no mention of either the Commodity Account Agreement or the transfer-of-funds authorization; it simply alleged that the transfers and the liquidations were wrongful and that Chipser "suffered a loss thereby." Record, vol. 1, at 2. The prayer for relief stated "plaintiff demands judgment of the defendants in the sum of $25,000.00." *Id.*

The pretrial order tersely stated the plaintiff's theories of recovery in the following terms: "breach of contract, breach of the general duty of a broker, and violation of the provisions of 7 U.S.C. §§ 6(b) and 6(d) [sic §§ 6b and 6d]."[7] The order shed no light on how Chipser intended to calculate his damages. In apparent recognition that this brief statement was an inadequate basis on which to try the case, the order also provided that Chipser was to file a trial memorandum setting forth explicitly his theories of recovery. Since neither Chipser's memorandum nor Kohlmeyer's response were made part of the record on appeal, we cannot tell whether they would have aided the trial judge, who had no involvement in the case prior to trial, in understanding what this case is about.

Chipser proceeded at trial on four separate claims for relief: breach of the Commodity Account Agreement, breach of the transfer-of-funds authorization, breach of the fiduciary duty of a broker, and violation of the Commodity Exchange Act. He was permitted to amend his complaint on the

day of trial to demand punitive damages, but there was no specification of the amount or the theory of recovery to which they related.[8]

It became clear at trial that Chipser was seeking compensatory damages in at least the amount of the charges made to his account on the liquidation of his wheat spread contracts. In addition, Chipser testified that he had consistently made money on his commodities speculations by following a well-known investment plan known as the three point reversal charting method. He introduced evidence showing the closing prices for July and December wheat on each day from the time he purchased the contracts in May until July 20, 1973, the last day of trading in July wheat contracts. If he had followed his method, Chipser testified, he would have closed out his spreads on or about June 26, 1973, at a profit of $500 on the ten contracts. His attorney argued to the jury that "at least sixty-eight hundred dollars compensatory damages" had been shown (which is approximately the sum of the charges to Chipser's account plus $500) and also urged the jury to award Chipser $25,000 in punitive damages. Record, vol. 2, at 589.

The judge's charge to the jury was sufficiently general to accommodate Chipser's measure of compensatory damages; no specific instructions were given as to how to calculate them. The jury was instructed that it could assess punitive damages only if it found that Kohlmeyer had breached its fiduciary duty to Chipser. The verdict awarded $6,742.04 in compensatory damages[9] and $8,500 in punitive damages.

---

7. These are sections 4b and 4d, respectively, of the Commodity Exchange Act, 7 U.S.C.A. §§ 6b, 6d (West Supp.1979). The act was amended after Chipser filed his complaint, see note 14 *infra*, although these sections remained substantially unchanged. Section 4b makes it unlawful for a commodities broker "to cheat or defraud" a customer or willfully to deceive or make false statements or reports to a customer in connection with transactions on the commodities exchange. Section 4d prohibits the misuse by brokers of margin deposits made by customers.

8. Chipser never amended his complaint to set out his four claims for relief in individual counts, a separation that would certainly have "facilitate[d] the clear presentation of the matters" at issue in this case. *See* Fed.R.Civ.P. 10(b).

9. This figure is some $100 less than the amount that results from a computation according to Chipser's argument. Lacking specific instructions on how to calculate damages, the jury evidently selected from the exhibits a figure that approached the approximately $6,800 in compensatory damages to which Chipser ar-

Kohlmeyer made timely motions for judgment n. o. v. and a new trial. These were granted on the ground "that there was a failure of proof on proximate cause, and that no damages were in fact proved as a result of the actions of the defendant." *Id.*, vol. 1, at 26. The court held also that it had erred in submitting the issues of custom and usage and punitive damages to the jury.[10] The order granting these motions is the basis for this appeal.

## III

Because the case was submitted to the jury on a general verdict, we cannot determine with certainty what theory or theories of liability were accepted by the jury.[11] In entering judgment n. o. v., however, the district court evidently believed that the failure of proof on proximate cause applied to all four theories. We must reverse the judgment, therefore, if there was substantial evidence, *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (en banc), as to any one of Chipser's claims, from which the jury could have concluded that he was damaged as a result of Kohlmeyer's actions.

■ We are handicapped in our ability to answer this question by the confused handling of the case at trial. At no time during the prosecution of the case, from the complaint and answer to the final charge to the jury, did the parties agree as to the terms of their contractual relationship, and we can find no place in the record where

the court resolved these issues. The Commodity Account Agreement provided for liquidation without notice but also said that custom and usage of the exchange would be followed. Because there was testimony that it was the custom to give notice prior to liquidation of a customer's trades, the jury was instructed that the contract was ambiguous but was never instructed what to do once it had resolved the ambiguity. The charge conference and most of the argument on Kohlmeyer's motion for directed verdict at the close of all the evidence were off the record. Thus, we are unable to determine how the jury instructions were formulated or on what basis the claims were allowed to go to the jury. Kohlmeyer's motion for new trial claimed several errors in the instructions respecting the parties' agreements; in granting the motion for new trial the court stated that it erred in instructing the jury on custom and usage. It is obvious that on remand and prior to the commencement of the retrial the contract issues must be properly framed, and the court must determine what evidence may be received to explain or amplify the written agreements and the precise contract issues if any that are to be resolved by the jury.[12]

■ The confusion of the contract issues precludes any meaningful discussion of the tort claim for breach of duty. A broker's duty to his customer can be modified in important respects by contract, 12 Am.

---

gued he was entitled. The number seized upon by the jury was the debit balance in Chipser's stock margin account as of May 25, 1973, *see* Plaintiff's Exh. 5, a sum unrelated to any possible damage theory for this case. The jury clearly accepted Chipser's argument, however, and sought to award damages in accord with it.

10. Further grounds given by the court were that punitive damages were not recoverable under the pleadings and proof in the case, that the defendant was prejudiced by an amendment on the day of trial claiming punitive damages, and that the verdict was against the great weight of the evidence.

11. Since punitive damages were awarded, the jury, if it followed the instructions, evidently

believed Kohlmeyer had breached its fiduciary duty as a broker. However, that does not eliminate the other claims, because the jury was also instructed that it could award compensatory damages only once even if it found Kohlmeyer liable under all four theories of recovery.

12. On this appeal, the parties cannot even agree what law governs the contracts. Kohlmeyer points to the provision in the Commodity Account Agreement that states that New York law applies. Chipser counters that Alabama law would apply because all significant contacts between the parties took place in that state. This conflict of laws issue was never presented to the district court and should be resolved on remand.

Jur.2d *Brokers* § 83 (1964), so that without clarification of the terms of the contracts, the scope of Kohlmeyer's fiduciary duty is undefined. It may well be that Chipser has a good claim sounding in tort or contract, but the present record simply provides an inadequate basis on which to resolve the issues raised regarding those claims.[13]

## IV

We are thus left with the fraud claim under the Commodity Exchange Act. That act nowhere expressly provides for a private cause of action for damages for violation of its provisions. Although the question has never been decided by this court, several courts have held that a private right of action is implicit in the statute. *E.g., Case & Co. v. Board of Trade,* 523 F.2d 355, 360 (7th Cir. 1975); *Hofmayer v. Dean Witter & Co.,* 459 F.Supp. 733, 737 (N.D.Cal.1978) (citing cases). It does not appear that the existence of a private cause of action was seriously contested in the court below, and the issue has not been raised or briefed on this appeal. "The question whether a cause of action exists is not a question of jurisdiction, and therefore may be assumed without being decided."

*Burks v. Lasker,* —— U.S. ——, 99 S.Ct. 1831, 1836 n. 5, 60 L.Ed.2d 404 (1979). We think this is the appropriate course to follow in this case.[14]

We now reach the issue of damages. The parties have attempted to distinguish proximate cause from the measure of damages, but the distinction strikes us as more metaphysical than real; the question presented is what damages, if any, proximately resulted from Kohlmeyer's actions. We have been cited to no case directly controlling, and our own research has disclosed none.

On the particular facts of this case, however, we have found instructive the decision in *Mitchell v. Texas Gulf Sulphur Co.,* 446 F.2d 90, 104–06 (10th Cir.), *cert. denied,* 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971), *cert. denied sub nom. Reynolds v. Texas Gulf Sulpher Co.,* 405 U.S. 918, 92 S.Ct. 943, 30 L.Ed.2d 788 (1972). There the plaintiffs sold their shares of stock because of a misleadingly pessimistic press release by the company. When the true facts became known, the stock price went up. Eschewing the restitution remedy sought by the plaintiffs, the court held the measure of damages to be the amount it would have

13. Notwithstanding the dispute over the contract terms, Kohlmeyer argues that *Geldermann & Co. v. Lane Processing, Inc.,* 527 F.2d 571 (8th Cir. 1975), requires that we affirm the district court. The court there held that Rule 209 of the C.B.O.T. and a commodity account agreement nearly identical to the one in this case were not unconscionable. Rule 209 provides that brokers may close out the trades of customers who fail to make margin deposits within a reasonable time and that one hour is normally a reasonable time. Kohlmeyer would have us hold that all of its actions were sanctioned by the contract and Rule 209, which *Geldermann* held valid. This we cannot do. There was no dispute in *Geldermann* over interpretation of the contract; the plaintiff simply claimed its terms were unfairly harsh. Here, the trial judge never construed the contract; he simply declared it ambiguous and left its construction to the jury. Moreover, Kohlmeyer concedes that no attempt was made to reach Chipser before the June 1 liquidation, whereas in *Geldermann* it was undisputed that notice was given prior to the liquidation. Under these circumstances, we cannot find that *Geldermann* controls this case.

14. The Supreme Court's decision in *Cannon v. University of Chicago,* —— U.S. ——, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), affirms that the implication of a cause of action is a question of statutory construction to be answered by consideration of the factors enumerated in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). No reported decision has, to our knowledge, applied a *Cort v. Ash* analysis to the Commodity Exchange Act as it stood prior to the amendments enacted by the Commodity Futures Trading Commission Act of 1974, Pub.L. No. 93–463, 88 Stat. 1389, and the Futures Trading Act of 1978, Pub.L. No. 95–405, 92 Stat. 865. Chipser's complaint was filed before the statute was amended, so cases dealing with the act as amended, see *Berman v. Bache, Halsey, Stuart, Shields, Inc.,* 467 F.Supp. 311, 320–23 (S.D.Ohio 1979); *Smith v. Groover,* 468 F.Supp. 105 (N.D.Ill.1979), are not germane. We think this question of an implied cause of action under the prior act ought to be treated in the first instance by the district court. It will have the opportunity to do so if Chipser elects to pursue this claim on remand.

taken a reasonable investor to reinvest in the market within a reasonable time after he learned the true facts. That award, the court believed, would best serve to return the injured parties "to the positions they would have enjoyed had they not been fraudulently induced to sell their stock." 446 F.2d at 104.

■ Chipser's essential claim is that he received no notice prior to the June 1 liquidation of half his contracts and that fraudulent misrepresentations made to him on June 4 induced him to allow the rest of his contracts to be liquidated. Although *Mitchell* was a securities case and we deal here with commodities contracts, which are not securities, *see Moody v. Bache & Co.*, 570 F.2d 523, 525 (5th Cir. 1978); *SEC v. Continental Commodities Corp.*, 497 F.2d 516, 520 n.9 (5th Cir. 1974), *Mitchell* is nonetheless helpful. There, as here, the plaintiff claims that but for the defendant's actions, he would have stayed in the market and profited. The *Mitchell* plaintiffs' failure to reinvest in the market within a reasonable time after the true facts were made public was deemed a decision to stay out of the market and no damages were permitted for increases in the stock price after that point. Chipser did not reinvest in the market and did not even demand that Kohlmeyer reinstate his wheat spreads. His failure to do so amounts to a decision to get out of the wheat market and not risk a further loss. Therefore, an award of damages measured by the difference between the spread at the time Chipser's contracts were liquidated and the spread at the time he is deemed to have decided to stay out of the market would justly compensate him. Having decided to get out of the market, Chipser cannot be heard to claim, as he argued to the jury, that he is entitled to recover as if he had stayed in until June 26 when the spread was most profitable for him. In the words of *Mitchell*: "If he has failed to reinvest [or demand reinstatement,] he must suffer the consequences of his own judgment." 446 F.2d at 105. *Cf. PSG Co.*

*v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 417 F.2d 659, 663 n.9 (9th Cir. 1969), *cert. denied*, 397 U.S. 918, 90 S.Ct. 924, 25 L.Ed.2d 99 (1970) (customer whose order to his broker was wrongfully refused must place that order again to show damages unless damages can be shown by other means).

In setting aside the verdict, therefore, the district court was correct in finding no causal connection between Kohlmeyer's liquidation of the wheat spreads and the self-serving damages claimed by Chipser. But it was error to enter judgment in favor of Kohlmeyer, as there was evidence from which a properly instructed jury could have calculated Chipser's damages. The judgment n. o. v. is reversed.

### V

■ What we have said already should make it obvious that a new trial is required. The jury was never instructed how to calculate damages and its compensatory damages verdict reflects acceptance of Chipser's erroneous measure. Moreover, construction of the contract should not have been left entirely to the jury, as the court recognized when it said that the issue of custom and usage should not have gone to the jury. Since these reasons support the district court's order, we need not decide whether the punitive damages claim should also have been withheld from the jury.

AFFIRMED in part, REVERSED in part and REMANDED.