**J.E. HOETGER & CO., a Michigan corporation, Plaintiff,**

v.

**Ruben ASCENCIO, Jr., individually, and Merrill Lynch, Pierce, Fenner & Smith, Inc., a Delaware corporation, jointly and severally, Defendants,**

**and**

**MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., a Delaware corporation, Counter-Plaintiff,**

v.

**J.E. HOETGER & CO., a Michigan corporation, Counter-Defendant.**

Civ. A. No. 82–72798.

United States District Court, E.D. Michigan, S.D.

Oct. 12, 1983.

See also, 558 F.Supp. 1361.

Elwood S. Simon, Lawrence M. Dudek, Southfield, Mich., for plaintiff.

Douglas G. Graham, Dennis K. Egan, Detroit, Mich., for defendants.

## OPINION

FEIKENS, Chief Judge.

This action arises out of commodity trading transactions involving plaintiff counter-defendant J.E. Hoetger & Co., defendant Ruben Ascencio, and defendant counter-plaintiff Merrill Lynch, Pierce, Fenner & Smith. Plaintiff claims that in the course of such transactions defendants made misrepresentations and omissions of material fact which violated provisions of the Commodity Exchange Act (CEA), 7 U.S.C. § 1 *et seq.*, and breached common law duties. Defendant Merrill Lynch claims there is a deficiency in plaintiff's account and counterclaims for such deficiency.

A federal question exists with regard to claims under the CEA, and jurisdiction lies under 28 U.S.C. § 1331.

## I. BACKGROUND

Plaintiff J.E. Hoetger & Co. is a Michigan corporation which was engaged in the business of commercial and industrial construction. Jon Hoetger was and is the chief executive officer and principal shareholder of Hoetger & Co. In August, 1979, Hoetger became interested in investing in treasury bill (T-Bill) futures. To do this he contacted defendant Merrill Lynch and was assigned to account executive Ruben Ascencio. On September 6, 1979, Hoetger and Ascencio met at a restaurant to discuss investment possibilities. At the conclusion of this meeting, Hoetger, acting on behalf of Hoetger & Co., signed a Merrill Lynch commodity account agreement and thereby opened a commodity account in his corporation's name.

On September 7, 1979, Hoetger began trading and purchased three June, 1980 T-Bill contracts. On September 12, he purchased two additional June, 1980 contracts. On September 17, Hoetger, acting on Ascencio's advice, sold the five contracts at a profit of $5,025. On September 18, Hoetger purchased seven more June, 1980 contracts and sold them the next day at a $7,845 profit. On September 20, he purchased twelve June, 1980 contracts, and again sold them the next day at a $8,820 profit. In a period of less than two weeks he traded 24 contracts for a total profit of $21,700.

Hoetger's luck in the market was not to last. On September 25, he purchased fourteen June, 1980 contracts, and on September 28, he purchased four March, 1980 con-

tracts. Following these purchases the price of the contracts declined moderately for several days. On October 2 and 3 the prices rebounded slightly, and Ascencio recommended that Hoetger sell the contracts and liquidate his position. Hoetger declined to do so.

On October 6, 1979, Federal Reserve Chairman Paul Volcker announced a new fiscal policy which would concentrate to a greater extent on the control of money supply and less on the control of interest rates. The effect of this announcement was an immediate increase in interest rates and a concomitant precipitous decrease in the price of T-Bill futures contracts.

On January 25, 1980, Hoetger sold his four March, 1980 contracts at a loss of $23,060. On February 21, 1980, he sold his fourteen June, 1980 contracts at a loss of $178,710. In the ensuing several months Hoetger made a number of smaller volume purchases and sales which resulted in a net loss of approximately $16,000. In April, 1980, he closed his account and remained out of the market for a period of approximately seven months. In December, 1980, he reactivated his account and again traded T-Bill futures contracts during the period between December 23, 1980 and February 17, 1981. During this trading period Hoetger sustained additional losses of approximately $30,000. The account was finally liquidated on February 17, 1981, at which time Hoetger owed a balance of $13,219 to Merrill Lynch.

## II. DISCUSSION

Hoetger seeks to recoup his losses claiming that they were the result of breaches of duty and violations of statute on the part of Merrill Lynch and Ascencio. Specifically, Hoetger contends that defendants are liable under 7 U.S.C. § 6b of the CEA for misrepresentation and omission of facts, as well as for breach of duty to supervise as required by 17 C.F.R. § 166.3, and for violation of their own in-house rule in breach of common law duties. In that the alleged failure to supervise is only in relation to allowing

the other alleged violations to occur, that claim need not be dealt with separately.

### A. VIOLATION OF 7 U.S.C. § 6b

Hoetger contends that defendants intentionally and/or negligently misrepresented or omitted material facts in their dealings with Hoetger, and that such actions constitute fraud in violation of § 6b of the CEA. The U.S. Supreme Court recently held that there is a private cause of action under § 6b of the CEA. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). Plaintiff correctly notes that there is authority which holds that misrepresentation or omission of material facts can constitute fraud in violation of § 6b. *Gordon v. Shearson Hayden Stone, Inc.* ['80–82 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21.-016 (1980); *Yameen v. Madda Trading Co.,* ['80–82 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21.125 (1980). Hoetger contends that defendants violated § 6b with two different sorts of misrepresentations: misrepresentations with regard to the degree of risk involved in commodities futures trading; and misrepresentations with regard to Ascencio's status as a registered "associated person" with the Commodity Futures Trading Commission. For reasons stated, I find that defendants did not make such misrepresentations or omissions of fact as would allow recovery under the CEA.

### 1. *Failure to Disclose Risk*

■ Hoetger's contentions in this action cannot be fully understood without a basic understanding of the nature of T-Bill futures contracts trading. The contracts traded were 90-day Treasury bill futures contracts which are traded on the International Monetary Market. Each contract, if held to maturity, requires the purchaser to accept delivery of, and the seller to deliver, $1 million in 90-day T-Bills on a specified date. The "price" of such contracts is stated as the difference between the actual T-Bill yield and 100.00%. Thus, a price of "91.90" represents a yield of 8.10% (100.00 minus 91.90). As interest rates drop, the

price of the contract rises. Price movement is discussed in terms of basis points, with 100 basis points equalling one percentage point. Thus, a market increase from 91.90 to 92.00 represents an increase of ten basis points and, at $25.00 per point, a profit of $250 per contract. In order to control $1,000,000 in T-Bills, an investor must purchase one contract, and in order to purchase such a contract, the investor must put up an initial maintenance deposit. The amount of the maintenance deposit may vary between brokerage houses and between individual investors. At the time Hoetger began trading the maintenance requirement was $1,000 per contract.

This maintenance deposit is not the amount invested or the cost of purchasing a contract; it is merely an arbitrary amount which is intended to provide readily accessible cash to cover relatively minor market fluctuations. For instance, if the price of a particular contract were to fall by 20 basis points, the value of the contract would decrease by $500 (20 points $\times$ $25 per point) and the maintenance deposit would cover such a loss. If the price were to then fall by an additional 40 basis points, it would represent a further decline in value of $1,000. Since the initial maintenance deposit of $1,000 would no longer cover the loss, the investor may be required to furnish additional maintenance funds if he wishes to hold onto the contract. Thus, the initial maintenance deposit is not "the investment", but is only the initial cost of entering into the investment. If the price of the contract rises or falls by several hundred points, as often happens in a relatively short time, the investor's gains or losses on a single contract can be far in excess of the initial maintenance requirement.

Hoetger's principal allegations of misrepresentation and omission of fact deal with disclosure of the extent of risk involved in trading T-Bill futures. He contends that in entering into such trading he believed that the most he could possibly lose was the entire maintenance requirement, and that if he had known that there was the potential for losing more than the initial maintenance deposit, he would never have entered into such transactions. He claims that such misrepresentations and omissions of fact caused him to suffer his trading losses and asks that he be compensated for such damages. For reasons stated, I find that Hoetger was fully apprised of the risks involved at the time he entered into trading, and that, even if he was ignorant of the extent of risks at the onset of trading, he was fully aware of and voluntarily assumed such risks before he suffered any losses.

Hoetger testified that he first became interested in trading T-Bill futures after reading a newspaper article on the subject written by Dan Dorfman and published in the Detroit Free Press on August 20, 1979. Hoetger and Ascencio met at a restaurant on September 6, 1979 to discuss the possibility of such trading. The meeting lasted for approximately two hours, with approximately one hour spent discussing the mechanics of T-Bill futures trading. Neither Hoetger nor Ascencio recall Ascencio specifically mentioning that Hoetger could lose more than his initial maintenance amount or that he could be required to put up additional maintenance funds. Hoetger testified that he told Ascencio that he had recently received $5,000 in a windfall settlement, that he was willing to invest it in a risky and speculative venture, and that he did not fear the prospect of losing it all. At the close of the meeting Hoetger signed a Merrill Lynch commodity account agreement, and trading started the next day.

According to Hoetger, throughout this meeting and subsequent trading he labored under the false assumption that all he was risking was his maintenance deposit, and that he would somehow not be liable for losses beyond that amount. I find that Hoetger's claim of ignorance of the extent of potential losses is not credible.

There is little evidence which supports Hoetger's claim of ignorance. There is his own testimony which, of course, is self-serving. Moreover, his testimony was marred by an inability to remember many facts which would have demonstrated his knowledge and by an inability to explain how, in

the face of extensive evidence to the contrary, he came to believe that his potential losses were limited. The only other evidence supportive of Hoetger's contention is the uncontested fact that Hoetger told Ascencio he had a limited amount of funds he did not mind losing,[1] and that, at their September 6 meeting, Ascencio did not specifically list the extent of risks involved.

There is a mass of evidence which militates in favor of a finding that Hoetger was fully apprised and aware of the risks involved. First there is Hoetger's character. He is an obviously intelligent and competent individual who demonstrated his abilities by his impressive performance under direct and cross examination. He has a Bachelor's Degree in Business Administration and has taken several courses towards his Masters in Business Administration. He has taken at least one course in securities analysis, and, at the time he entered into trading, was a successful businessman with a company worth between $200,000 and $500,000. He had invested in T-Bills and commercial paper in the past and actively followed interest rates on a daily basis.

One may reasonably assume that an individual with Hoetger's business acumen would be aware of something as fundamental as the extent of his risk in an investment.

Additional evidence of Hoetger's knowledge is found in the papers he signed. It is undisputed that Hoetger read and signed the commodity account agreement at the September 6 meeting prior to opening his account. Paragraph 9 of that agreement highlights the risk involved in such trading and the fact that losses may exceed maintenance deposits.[2] Ascencio testified that Hoetger also read and signed a risk disclosure statement at the September 6 meeting. This disclosure, which is required by regulations,[3] is a brief, understandable document which clearly discloses the substance of the risks involved.[4] Hoetger denies that he was given the disclosure at the meeting, but admits that he received it in the mail within several days after the meeting and before any trading losses were incurred.

James McDermott, the then Administrative Manager of the Merrill Lynch branch office where Hoetger traded, testified that

1. Ascencio admits that Hoetger said he had a limited amount he did not mind losing, but contends that the amount was $8,000, rather than the $5,000 claimed by Hoetger.

2. Paragraph 9 provides in full: "You acknowledge that unless this is a hedge account, investment in commodity futures contracts is speculative, involves a high degree of risk and is suitable only for persons who can assume the risk of substantial losses. You also understand that because of the low margin normally required in commodity futures trading, price changes in commodity futures contracts may result in significant losses, which losses may exceed your margin deposit."

3. 17 C.F.R. § 1.55.

4. The disclosure provides in pertinent part:
"The risk of loss in trading commodity futures contracts can be substantial. You should therefore carefully consider whether such trading is suitable for you in light of your financial condition. In considering whether to trade, you should be aware of the following:
(1) You may sustain a total loss of the initial margin funds and any additional funds that you deposit with your broker to establish or maintain a position in the commodity futures market. If the market moves against your position, you may be called upon by your broker to deposit a substantial amount of additional margin funds, on short notice, in order to maintain your position. If you do not provide the required funds within the prescribed time, your position may be liquidated at a loss, and you will be liable for any resulting deficit in your account.
(2) Under certain market conditions, you may find it difficult or impossible to liquidate a position. This can occur; for example, when the market makes a "limit move."
(3) Placing contingent orders, such as a "stop-loss" or "stop limit" order, will not necessarily limit your losses to the intended accounts, since market conditions may make it impossible to execute such orders.
(4) A "spread" position may not be less risky than a simple "long" or short position.
(5) The high degree of leverage that is often obtainable in futures trading because of the small margin requirements can work against you as well as for you. The use of leverage can lead to large losses as well as gains. This brief statement cannot, of course, disclose all the risks and other significant aspects of the commodity markets. You should therefore, carefully study futures trading before you trade.

he telephoned Hoetger on September 21, 1979, to further explain the risks of commodity trading. This conversation was at Ascencio's request and was brought on by Hoetger's desire to expand his trading in light of his initial success. McDermott testified that he told Hoetger that such trading was very risky, and that he could "lose it all" overnight. He further testified that he told Hoetger of the risk of down limit days[5], and that there was a possibility that he would lose all his maintenance deposit and be required to deposit additional funds. McDermott testified that Hoetger understood the risks involved, and in fact, seemed to have a better understanding of commodity future trading than did McDermott. Finally, he testified that Hoetger stated that he was a "big boy" and was willing to take the risks.

There is also circumstantial evidence of Hoetger's knowledge. It is admitted that Hoetger knew from the time of the meeting on September 6 that a change of one basis point caused a change in contract price of $25.00. This knowledge was confirmed in the first several weeks of trading when his contracts at times went up by over 40 basis points (over $1,000) in the course of a single day. It is a reasonable conclusion that a man of Hoetger's ability and experience would have been able to reason that, if a contract were to decline by more than 40 basis points, he would lose more than $1,000, and that he therefore had more at risk than his $1,000 maintenance deposit.

Perhaps the most compelling circumstantial evidence of Hoetger's knowledge is found in what he did not do. It is admitted by all parties that at some point in Hoetger's trading he came to understand that he could lose much more than his maintenance deposit; however, the record is devoid of any evidence of that enlightenment. If Hoetger had indeed been ignorant of the extent of his risk at the start of trading, but later learned of it in the course of his trading, one would expect some evidence of

such an awakening. When Hoetger first began to suspect that it was his whole life savings at risk, rather than a mere $5,000, it seems that he would have, at a minimum, contacted his broker to confirm such suspicion. While it strains credibility to accept the fact that Hoetger did not understand the risks at the onset of trading, it defies credibility to believe that when he did learn of them, he showed no manifestation of his rude awakening.

I thus conclude that there was never a time subsequent to the onset of trading when Hoetger believed that all he had at risk was his maintenance deposit. He was fully aware of all the risks involved and made a conscious decision to brave them. This is not to say that Hoetger is a liar. The mind is malleable and subject to delusion when one is faced with the prospect of losing his life savings. However, the evidence presented in this case clearly demonstrates that there was no misrepresentation involved, and that all of Hoetger's decisions were fully informed and deliberate.

**■** Furthermore, even if Hoetger's allegations of misrepresentations were true, recovery would be barred by a lack of proximate cause. Undisputed evidence was adduced at trial which showed that the prices of Hoetger's contracts began to fall on October 6, 1979, and continued to fall throughout the month. Hoetger's own testimony revealed that he was keeping track of the decline and of his total losses. He further testified that on October 23, he calculated that his total losses were $131,350, that he recognized that it would ruin him to absorb a loss of that magnitude, and that he decided he had no choice but to hold on to his contracts in the hope that they would recover. This testimony constitutes an admission that, at least as of October 23, Hoetger was fully aware of the extent of the risk and losses he could incur.

After October 23, the market took a turn for the better and there were several up limit days in a row. In fact, the market

---

**5.** A down limit day occurs when the price of T-Bills futures contracts falls by 50 basis points in the course of one day. At that point, trading is suspended for that day, and this suspension often makes it impossible to sell contracts before further losses are incurred.

rebounded to a point where Hoetger's overall trading went back into the black. For example, if Hoetger had liquidated his holdings on November 29, 1979, he would have had $10,400 in his account, or $5,400 more than he started with. Hoetger admittedly was monitoring the market on a daily or even hourly basis at this time and talked to Ascencio at least once a day about market movements. Hoetger testified that he was aware that the market had rebounded, but that he made a decision to stay in the market longer in the belief that it would continue to rise.

In order for damages to be awarded in a private action under the CEA, injury and causation must be present. In *Merrill Lynch v. Curran,* the Supreme Court specifically noted the necessity of a showing of causation, *supra* 102 S.Ct. at 1837, and of injury, *supra* 102 S.Ct. at 1847. In fact, a case cited by Hoetger for the proposition that misrepresentation or omission of facts can constitute fraud under § 6b stated, "Of course, in order to receive monetary damages, it will also be necessary to establish that the [misrepresentation] caused the financial harm to the commodity customer." *Gordon, supra* at 23,981 n. 35.

■ In *Chipser v. Kohlmeyer & Co.,* 600 F.2d 1061 (5th Cir.1979), the U.S. Court of Appeals for the Fifth Circuit was faced with a proximate cause question in an action under the CEA. The court noted that causation was an element in actions for damages, but acknowledged that there was little precedent dealing with the determination of such proximate cause. The plaintiff in *Chipser* contended that the broker's misrepresentation caused him to sell his contracts at an earlier date than he otherwise would have, and that he was due compensation for the amount he would have made if he had stayed in the market. The court noted that the plaintiff failed to re-enter the market, even after all misrepresentation had been dispelled, and held that, once there was no longer a misunderstanding, the plaintiff's decision to not re-enter the market was his own choice, and that damages incurred after that time were not

proximately caused by the initial misrepresentation.

In this case, as in *Chipser,* Hoetger claims that there was an initial misrepresentation which caused him to enter into trading which he would not have otherwise, and it is admitted that there came a time when any misrepresentations which may have existed were dispelled. Again, as in *Chipser,* Hoetger made a fully informed decision to stay in the market after his revelation. Since at a point of time after all misconceptions had been dispelled Hoetger could have discontinued trading and liquidate at a profit, any losses incurred by him after that point were the result of his own decision and were not proximately caused by defendant's actions. *See also, Mitchell v. Texas Gulf Sulphur Co.,* 446 F.2d 90 (10th Cir. 1971).

■ This same lack of causation precludes damages based on failure to comply with the requirements of 17 C.F.R. § 1.55 regarding risk disclosures. This regulation requires that a prospective investor must sign and date a risk disclosure statement prior to opening an account. In this case, the risk disclosure was not dated, and Hoetger claims that he did not receive or sign it until several days after the account was opened (a contention which Ascencio specifically denies). It is admitted, however, that Hoetger received and signed the required risk disclosure before September 19, 1979, at a time when he had incurred no losses. Thus, even if Hoetger's contentions are taken as true, any failure to comply with the strictures of 17 C.F.R. § 1.55 was not causally related to losses ultimately suffered.

2. *Failure To Disclose That Ascencio Was Not Registered*

■ Hoetger also claims misrepresentation by Merrill Lynch in not disclosing that Ascencio was not registered with the Commodity Futures Trading Commission as an associated person as is required by 7 U.S.C. § 6k. In granting partial summary judgment earlier in this case I found no private cause of action for a violation of the registration requirements of § 6k alone, and

that recovery for such violations would have to be by way of § 6b and would have to include a showing of causation. *J.E. Hoetger & Co. v. Ascencio,* 558 F.Supp. 1361 (E.D.Mich.1983). Here Hoetger brings such claim, but again fails to establish causation. It is conceded by defendants that, at the time of the opening of the account, Ascencio was unregistered and in violation of § 6k. However, evidence showed that at the time the account was opened, Ascencio had already filed his application to become an associated person and had completed a course on commodities at the New York Institute of Finance. Ascencio took and passed the required examination in October, 1979, and became registered on November 6, 1979. Hoetger did not even attempt to establish a causal connection between Ascencio's initial non-registration and the losses Hoetger incurred. The fact that Hoetger's actual losses were not suffered until after the market rebound of late November, 1979, would disprove contentions of causation. *See International Cattle Systems v. Parsons,* ['80–'82 Transfer Binder] Comm. Fut.L.Rep. (CCH) ¶ 21,367 (1982), (holding that causation must be shown in a claim of failure to register under § 6k).

### B. FAILURE TO ADHERE TO IN-HOUSE RULES

■ Hoetger's second claim is based upon defendants' alleged violation of their own in-house rules. These rules, which are contained in the Merrill Lynch Policy Manual, set forth the policies and operational guidelines of the firm. While Hoetger alleges a number of violations of these guidelines, his claims principally center around violations

of § 05.32.1, which states the firm's recommendations with respect to the types of individuals for whom commodities trading is appropriate,[6] and § 3.42 *et seq.,* which deals with trading limits.

When Hoetger opened his account his trading limit was set at $4,000, or four contracts. Within the first days of trading Hoetger exceeded that limit, and the limit was increased to accommodate his trading. Throughout the course of Hoetger's trading he often exceeded the established trading limits, and the limits were always extended, often after the fact, to accommodate his trading. Eventually Hoetger's limit was raised to $25,000, a limit which he never exceeded.

Hoetger's claim is a novel one. He contends that Merrill Lynch should not have allowed him to trade in the commodities futures market in that his temperament was not suited to it; should not have allowed him to exceed his established trading limits; and should not have extended his trading limits upward to accommodate his wishes. By admission the argument is a paternalistic one: that defendant should have protected Hoetger from his own greed. Hoetger's claim that a private cause of action lies for the violation of internal rules is predicated upon scant authority. He cites *Bercow v. Kidder, Peabody & Co.,* 39 F.R.D. 357 (S.D.N.Y.1965), which holds that a brokerage firm's operating manual is discoverable in a claim for inadequate supervision. He also cites several Michigan cases which hold that an employer's internal policies which are promulgated, and when are known of and relied on by the employ-

---

**6.** § 05.32.1 provides in pertinent part: "As a basic policy, the Corporation does not wish to handle speculative commodity business for individuals who cannot afford the risks, and for those who are temperamentally not suited to commodity trading. Those who are not willing to take the time to learn what they are doing should be discouraged from trading. While it is difficult, if not impossible, to set out hard and fast rules to determine whether a speculative commodity account should be opened, our experience has indicated certain factors which should be considered before the account is opened.

Obviously, each individual situation must be decided upon its own merits. We do not wish to handle speculative commodity business for individuals with small net worth or small annual income. Neither do we wish to handle business for those individuals regardless of net worth or income whose losses would be detrimental to their general standard of living nor for those whose family responsibilities are such that any loss of capital would impair the financial security of the individual and his dependents."

ees, can become part of an implied employment contract. *Toussaint v. Blue Cross & Blue Shield of Michigan,* 408 Mich. 579, 292 N.W.2d 880 (1980); *Schipani v. Ford Motor Co.,* 102 Mich.App. 606, 302 N.W.2d 307 (1981). These cases in no way hold that a broker can be held liable for violation of its own internal operating rules which are not known of or relied upon by investors.

The U.S. Court of Appeals for the Eighth Circuit was faced with a claim almost identical to this in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Goldman,* 593 F.2d 129 (8th Cir.1979). In *Goldman,* as in this case, the plaintiff claimed that defendant Merrill Lynch should be liable for allowing him to trade in the commodities market in violation of the firm's policies with regard to the character of investors for whom commodities trading was appropriate[7] and for allowing him to exceed his trading limit in a commodities account. The court rejected those claims and held that there was no authority recognizing a private cause of action for violations of a broker's house rules. The court also specifically held that violations of trading limits would not constitute a basis for the imposition of liability in the absence of fraud.

The trading limits imposed upon Hoetger were never intended to protect him from his own greed, as plaintiff seems to suggest.[8] Such limits are designed to protect the broker from being saddled with losses which the investor is not able to cover, as was ultimately the case here. This purpose is made clear by the statement in Merrill Lynch's Policy Manual: "A significant portion of the unsecured debits incurred by the Firm arise from accounts that are improperly trading over the limit established by the Corporate Credit Department. Thus, in view of the serious risk placed on the Firm by accounts trading over authorized limits, penalties will be imposed upon offices which permit violations." Merrill Lynch Policy Manual § 3.42.4. In *Carras v. Burns,* 516 F.2d 251 (4th Cir.1975), the court was faced with a claim of liability based upon violation of in-house margin maintenance requirements in a securities case. In finding no private cause of action for such a violation, the court held:

> "Margin maintenance requirements are established primarily to protect the solvency of brokers by assuring adequate collateral for their loans that finance customer speculation. Since they were not promulgated for the protection of investors, they create no cause of action. The broker may be disciplined for violation of the margin rules, but he would be liable to his customer only if his breach of the rules also violates the Act by operating as a fraud." (citation omitted)

*Id.* at 260. *See also Altschul v. Paine, Webber, Jackson & Curtis Inc.,* 518 F.Supp. 591 (S.D.N.Y.1981).

There are sound practical reasons for not allowing a private cause of action predicated upon violation of internal rules or policies. First, if such liability were allowed, it would impose the greatest additional liability on those firms policing themselves rigorously through the imposition of stringent internal guidelines; effectively punishing the diligent and favoring the lax. This would have the predictable effect of encouraging brokerage firms to alter their internal practices to conform with only the minimum requirements of the law.

Second, there are the practical problems involved in requiring a court to determine whether a firm's internal policies are in fact being violated. Such written or unwritten policies may be quite complicated, and their requirements are often not self evident.

---

7. Merrill Lynch's policy with regard to the preferred character of investors in *Goldman* was substantially similar to § 05.32.1 as set out in footnote 6 *supra.*

8. Hoetger notes that § 03.0 of the Merrill Lynch Policy Manual provides that, "[Compliance] means adherence to our own policies which may go beyond the requirements of the law, but which we believe are necessary to protect the interests of our customers and the Corporation." He argues that this statement demonstrates that all of the policy guidelines are for the benefit of the clientele and are thus inured with the force of law. I am not convinced that the inclusion of such a platitude has such far reaching legal effect.

Such is the case here in that defendants claim they did not violate their own trading limits because a special pilot program allowed local offices to extend trading limits to $25,000 without central office approval. In defining the actual requirements of such guidelines, the court would have little choice but to look to the firm's own internal practices and interpretations for guidance. This would present a peculiar situation in which a firm's apparent violations of its rules would be used to demonstrate the rule's actual requirements—an obviously circuitous undertaking. Thus, it is not only the dictates of the law, but those of common sense, which require the finding of no private cause of action predicated upon violation of in-house rules.

## III.  CONCLUSION

I find that none of Hoetger's trading losses were caused by violations of statute or breach of common law duties on the part of Merrill Lynch or Ascencio. I further find that any deficiency in Hoetger's account must be paid by Hoetger to Merrill Lynch. An appropriate order shall be submitted.

This opinion in its entirety constitutes my findings of fact and conclusions of law as are required by Fed.R.Civ.P. 52.