920 F.2d 1173
 59 USLW 2404, 13 UCC Rep.Serv.2d 872
 AGRA, GILL & DUFFUS, INC., a Delaware corporation, Plaintiff-Appellee,
v.
W. Arthur BENSON, Defendant-Appellant,
and
Frank M. Benson, Jr.; Stanley M. Naples; Lloyd J.
Patterson; J. Alan Lindauer; Roberto M. Pensotti; Texas
National Energy; C.B. White, Inc.; Forest Hill State Bank;
Gatoil (U.S.A.), Inc.; Gatoil International, Inc.; Kahil
J. Ghattas; Latina Oil Corporation; Latina Fuel
Corporation; Eton Enterprises, Inc.; Eton Fuel
Corporation, Defendants.
 No. 89-2779.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 6, 1990.
Decided Dec. 7, 1990.
 
 Rob Ross Hendrickson, argued, Frank Murray Benson, Jr., argued (Saul Z. Reese, on brief), Baltimore, Md., for defendant-appellant.
 Franklin Terrell Caudill, argued (David F. Albright, Harry Rifkin, Semmes, Bowen & Semmes on brief), Baltimore, Md., for plaintiff-appellee.
 Before PHILLIPS and WILKINSON, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 BUTZNER, Senior Circuit Judge:
 
 
 1
 The principal issue in this appeal is whether the customer or the broker should bear the loss resulting from the liquidation of a futures trading account. The customer concededly breached his contract with the broker and failed to meet margin calls. The broker did not follow the customer's orders to liquidate immediately. The jury returned a special verdict in favor of the customer by finding that the broker failed to conduct a commercially reasonable liquidation. After the district court entered judgment on the verdict, it granted judgment n.o.v. for the broker, concluding that the customer had failed to prove any injury caused by the broker. We affirm. We also affirm the dismissal of the customer's counterclaim.
 
 
 2
 * Arthur Benson traded heavily in heating oil and gasoline futures. Some of his positions constituted a majority of those in the market. Because of the size of his holdings, Benson sometimes found it difficult to sell without provoking an adverse market reaction. On November 22, 1982, there was a deficit in his account and it was undermargined. Benson told his broker, Gill and Duffus Services, Inc., that he was unable to meet any margin calls, to liquidate his account immediately, and to get him out of the market the next day at the opening of trading. He said he was sorry, he did not have much money, and he hoped the broker would not suffer any loss. The broker responded with a telegram that it would liquidate Benson's positions immediately and hold him responsible for the payment of any deficit in his account.
 
 
 3
 A group of experienced traders in the brokerage house decided the strategy they would follow in liquidating the account. Fearful that immediate liquidation would disrupt the market, the broker liquidated the account over a 15-day period. The broker suffered a loss of $1,360,821.37, which it seeks to recoup from Benson.
 
 
 4
 An expert testifying for Benson expressed the opinion that the broker's prolonged liquidation was unsound and the positions should have been liquidated immediately, regardless of the effect on the market. The expert also identified some unwise trades and an error that was not properly corrected. Nevertheless, he was unable to state that the proceeds of the liquidation would have been greater if any other course of liquidation had been followed.
 
 
 5
 At the conclusion of the evidence Benson had introduced no proof that the broker's liquidation strategy had caused him any loss, and the broker had introduced no proof that its liquidation had minimized loss. The broker moved for a directed verdict on two grounds: the liquidation was reasonable; and, even if it was not, Benson had not proved the extent of damages that flowed from an unreasonable liquidation.
 
 
 6
 The trial court was left with conflicting evidence about the commercial reasonableness of the liquidation but no evidence on which the jury could base a verdict on damages. At a conference held before the court instructed the jury, the parties and the court decided that if the jury accepted Benson's defense of commercially unreasonable liquidation, it would lack a basis for determining damages with any accuracy. Although Benson's accounts lost a fixed amount of money, all agreed that because the market was so volatile and Benson's portion of it so large, the evidence was too vague for an estimate of damages, other than the entire loss.
 
 
 7
 The court denied the broker's motion for a directed verdict. It decided that it would submit the question of commercially unreasonable liquidation to the jury in a special interrogatory. This procedure would resolve the controversy about liquidation, but it would not provide a means of determining who would bear the loss. To decide this issue the court said: "If I find that [Benson] had the burden of somehow proving what the increased loss was because of the unreasonableness of the liquidation, then [the broker] still wins if that's what I find as a matter of law because you [Benson] acknowledge you didn't prove that." The court told the parties that it would reserve final judgment until it could ascertain who shouldered the burden of proof on the issue of damages.
 
 
 8
 The court instructed the jury to return a special verdict in answer to the following interrogatory: "Do you find from a preponderance of the evidence that [the broker] failed to conduct a commercially reasonable liquidation?" The jury answered, "Yes," and the court entered judgment for Benson on the verdict.
 
 
 9
 The broker then filed a motion for judgment notwithstanding the verdict. In its decision on the motion, the court sustained the jury's finding that the broker failed to conduct a commercially reasonable liquidation. It next turned to the issue it had reserved during the trial. Citing a "fundamental common law rule," the court held that Benson bore the burden of proof as to damages and failed to carry it. Reasoning that "a claim of a commercially unreasonable liquidation is an affirmative defense as to which [Benson] bears the burden of proof," the court stated: "[I]n order to meet such a burden a party must prove not only that the plaintiff acted unreasonably but also that his action caused him to sustain a greater loss than he otherwise would have suffered."
 
 
 10
 The court held that Benson produced no evidence that the liquidation resulted in any diminution of the proceeds. It concluded that this "lack of evidence" was fatal to Benson's cause. The court entered judgment n.o.v. for the broker in the full amount of its loss resulting from the account's final deficit.II
 
 
 11
 The contract entitled "Commodity Customer's Agreement" set out in detail the terms governing the trading account Benson held with the broker. Paragraph 1 states that "[a]ll transactions" covered by the contract "shall be subject to the constitution, rules, regulations, customs, and usages of the exchange or market, and its clearing house, if any, where the transactions are executed," as well as the Commodity Exchange Act and the rules and regulations of the Commodity Futures Exchange Commission. It also provided that New York law governs the agreement and its enforcement.
 
 
 12
 The agreement provided that in the course of trading futures on Benson's behalf, the broker could demand that Benson maintain a certain amount of margin with the firm at all times. The agreement obligated Benson to deposit whatever amount of margin the broker required in its "discretion." Paragraph 7 of the agreement granted the broker broad authority to close out Benson's account:
 
 
 13
 You [the broker] are hereby authorized, in your discretion ... for any reason whatsoever [you] deem it necessary for your protection, to sell any or all of the commodities or other property which may be in your possession or which you may be carrying for [Benson].... Such sale ... may be made according to your judgment and may be made at your discretion ... and the undersigned shall remain liable for any deficiency....
 
 
 14
 A separate document executed at the time of the agreement, a "Risk Disclosure Statement," describes the broker's power of liquidation in similar sweeping terms. As added protection the agreement gives the broker a "general lien" in any property carried by the firm on Benson's behalf "for the discharge of all obligations of [Benson] to [the broker]."
 
 III
 
 15
 When Benson said that he could not meet his margin call, the broker treated this statement as a material breach and stopped following his orders. Benson asserts on appeal that he never breached his contract and that the broker therefore had a fiduciary duty to follow his liquidation orders. This argument comes too late. At trial defense counsel conceded that Benson breached the contract. In a colloquy with the court, defense counsel acknowledged: "There's a breach, I'm not saying there's no breach." In his appellate reply brief, Benson argues that the concession that he breached the contract was one of law. He cites a number of cases that a concession on the law is not binding. See, e.g., Saviano v. Commissioner, 765 F.2d 643, 645 (7th Cir.1985). He also cites cases that, implicitly at least, hold a refusal to meet a margin call and order a liquidation of a customer's account is not a breach of contract. See, e.g., Keller v. Scoular-Bishop, Inc., [1984-86 Transfer Binder] Comm.Fut.L.Rep. (CCH) p 22,477 (CFTC Jan. 17, 1985).
 
 
 16
 The difficulty with these arguments is that they were not raised at trial. We will not accept on appeal theories that were not raised in the district court except under unusual circumstances that would result in a miscarriage of justice. See National Wildlife Federation v. Hanson, 859 F.2d 313, 318 (4th Cir.1988); G. Heileman Brewing Co. v. Stroh Brewery Co., 843 F.2d 169, 172 (4th Cir.1988). Circumstances warranting a departure from the general rule do not exist in this case. Benson was represented by competent counsel who successfully defeated the broker's claim that Benson and his associates were guilty of fraud and racketeering. The court accepted the concession that Benson had breached his agreement with the broker. Its instructions to the jury implicitly recognized that this aspect of the case had been resolved. Another reason for applying the general rule is that Benson's predicate for departure is faulty. He cites no case holding that the question of breach is a matter of law. On the contrary, whether a breach justifies an injured party from suspending performance depends on materiality of the breach. Whether a breach is material is a question of fact. 2 E. Farnsworth, Contracts Sec. 8.16 (1990). The evidence disclosed that Benson's failure to meet a margin call was material, because on a declining market the failure put the broker at risk. Consequently, after Benson breached the contract, the broker was not obligated to follow Benson's order to take him out of the market at the opening next day. Nevertheless, overriding the broker's discretion to select the manner of liquidation was its duty to mitigate Benson's damages, which in this context meant to liquidate in a commercially reasonable manner.
 
 
 17
 The parties stipulated that New York law should govern their agreement and its enforcement. Air et Chaleur, S.A. v. Janeway, 757 F.2d 489 (2d Cir.1985), explains the application of New York law to a situation that bears resemblance to the present controversy. In that case the plaintiffs proved that the defendant breached an agreement made in 1979 to purchase in October 1981 stock owned by the plaintiffs. The court held that the plaintiffs were obligated to mitigate their damages, saying "New York courts adhere to the universally accepted principle that a harmed plaintiff must mitigate damages." 757 F.2d at 494. Even though the plaintiffs apparently failed to mitigate their damages because they continued to hold the stock after learning that the defendant would not honor his commitment to purchase, the district court directed a verdict and awarded damages to the plaintiffs in the full amount of their loss. The plaintiffs prevailed because the defendant failed to prove damages arising out of the failure to mitigate. Affirming the judgment, the court of appeals said: "[T]he district court was also correct in holding that defendant bore the burden of introducing evidence to prove that plaintiffs could have lessened their damages." 757 F.2d at 494.
 
 
 18
 Applying the lesson that Air et Chaleur teaches, we conclude that the district court correctly followed New York law. The obligation to mitigate required Benson's broker to liquidate the account in a commercially reasonable manner. Its failure to do so justified the special verdict in Benson's favor on the issue of mitigation.
 
 
 19
 In addition to proving failure to mitigate, Benson was required by New York law to introduce evidence proving that the broker could have reduced his damages. Air et Chaleur, 757 F.2d at 494. This he failed to do. As the district court observed in its opinion granting judgment n.o.v., Benson's expert "was unable to testify that the proceeds of the liquidation would have been greater if any different method of liquidation had been used." It was Benson's inability to prove damages that was fatal to his affirmative defense of commercially unreasonable liquidation.
 
 
 20
 The district court's grant of judgment n.o.v. was also consistent with the Commodity Exchange Act, 7 U.S.C. Secs. 1 et seq., which the parties stipulated also governs their agreement. A customer asserting that a broker violated the Act must show not only the violation but also that the violation caused injury to the customer. Merrill Lynch, Pierce, Fenner & Smith v. Curran, 456 U.S. 353, 374, 394, 102 S.Ct. 1825, 1837, 1847, 72 L.Ed.2d 182 (1982) (dicta). The principles explained in Merrill Lynch were applied in J.E. Hoetger & Co. v. Ascencio, 572 F.Supp. 814 (E.D.Mich.1983). In that case the court held that even if a broker made misrepresentations and omissions in handling a customer's account, the customer could not recover damages because he had not proved that the broker's faults caused him financial harm. 572 F.Supp. at 820. To repeat, this is Benson's situation. He was unable to prove that the broker's commercially unreasonable liquidation caused him any financial harm.
 
 
 21
 Benson cites several commission cases which held brokers, rather than customers, liable for deficits in the customers' accounts when the broker failed to liquidate after the accounts became undermargined. See, e.g., Gerbing v. Loeb Rhoades Hornblower & Co., [1984-86 Transfer Binder] Comm.Fut.L.Rep. (CCH) p 22,494 at 30,195 (CFTC Feb. 14, 1985); Flynn v. First Nat'l Monetary Corp., [1980-82 Transfer Binder] Comm.Fut.L.Rep. p 21,396 at 25,901 (CFTC Mar. 9, 1982). The commission has also held a broker liable for failure to follow a customer's order to close out an account when the account became undermargined. Keller v. Scoular-Bishop of Missouri, Inc., [1984-86 Transfer Binder] Comm.Fut.L.Rep. p 22,477 (CFTC Jan. 17, 1985); see also Dizak v. ContiCommodity Services, Inc., Comm.Fut.L.Rep. p 22,810, at 31,389 (CFTC Oct. 31, 1985). In each case the commission held that the broker should have liquidated immediately and the customers were held liable only for the value of the account at the time they ordered liquidation.
 
 
 22
 The commission cases superficially resemble the situation presented here. There are, however, important differences. Primarily they differ because the customer was able to prove damages. The commission cases involved small numbers of future contracts. The commission could, therefore, easily assess the damages by determining the market price of the contracts at the time the broker should have sold the contracts. Benson, in contrast, was not able to prove damages. Because his positions were so large in relation to the entire market, and the market was so volatile, Benson was unable to prove that any other method of liquidation would have reduced the loss.
 
 
 23
 Another distinction is the continued validity of the futures contract in the commission cases. In no case cited by Benson did the commission find material breach by the customer. The broker was, therefore, under a contractual duty to continue to follow the orders of the customer. In contrast, Benson explicitly conceded his breach.
 
 
 24
 Benson also argues that article nine of the Uniform Commercial Code applies to this case and that the broker therefore has the burden of proving that its sale of collateral upon the debtor's default was commercially reasonable and that it gave due notice of the sale to the debtor. He relies on the principle that in the absence of evidence that a security was sold in a commercially reasonable manner without proof of the fair value of the security, the creditor cannot recover a deficiency. See, e.g., Security Trust Co. v. Thomas, 59 A.D.2d 242, 247, 399 N.Y.S.2d 511, 514 (1977).
 
 
 25
 Article nine does not apply to this case. New York law does not consider that a futures transaction is a security within the purview of article nine of the Uniform Commercial Code. See Cohn, Ivers & Co. v. Gross, 56 Misc.2d 491, 289 N.Y.S.2d 301, 304-05 (App.Term 1968) (call on stock); 8 R. Anderson, Uniform Commercial Code Sec. 8-102:9 at 29 (1985).
 
 
 26
 Benson argues that, alternatively, the New York law of pledge applies. However, the New York Uniform Commercial Code has incorporated previous law, including pledge. Sumner v. Century Nat'l Bank & Trust Co., 92 Misc.2d 726, 402 N.Y.S.2d 285, 288 (Sup.Ct.1978); 2 J. White & R. Summers, The Uniform Commercial Code Sec. 23-1 at 241 (2d ed. 1988). Benson, therefore, cannot rely upon pledge.
 
 IV
 
 27
 Benson also contends that Agra, Gill & Duffus, Inc., lacks standing to bring this action against him. Gill and Duffus Services, Inc., was the broker that liquidated Benson's account. Gill and Duffus later merged into Agra Trading, and the new entity became Agra, Gill and Duffus, Inc. (AG & D). Gill and Duffus commenced this action, and the district court allowed an amendment to the complaint reflecting the merger. Benson argues that AG & D has neither proved it is the successor in interest to Gill and Duffus' claims against Benson nor demonstrated an assignment of the claims. AG & D must show one of these to have standing according to Benson. Benson relies principally upon AG & D's failure to proffer formal articles of merger, which he claims are required under applicable state law.
 
 
 28
 Gill and Duffus and Agra Trading were subsidiaries of the same parent corporation, Gill and Duffus Holdings. An officer of Gill and Duffus Holdings described in detail the nature of the merger, which among other things provided that the merged entity, AG & D, assumed all assets and liabilities previously belonging to Gill and Duffus. Nothing in the record contradicts his account of the merger. We find no error in the district court's conclusion that AG & D is a proper plaintiff in this lawsuit.
 
 V
 
 29
 Benson counterclaims for lost profits, which he asserts he would have made if his account had been liquidated properly. He calculates his lost profits as the highest intermediate value of his account during the time when his account should have been liquidated, which he believes is $1,048,876.20. He relies on the presumption that the measure of damages when a broker trades without authorization is the "highest intermediate value reached by the stock between the time of the wrongful act complained of and a reasonable time thereafter." Schultz v. Commodity Futures Trading Comm., 716 F.2d 136, 139 (2d Cir.1983) (quoting Galigher v. Jones, 129 U.S. 193, 200, 9 S.Ct. 335, 337, 32 L.Ed. 658 (1889)).
 
 
 30
 A customer is entitled to damages when the broker neglects to follow binding instructions. See Schultz, 716 F.2d at 139-40. But following Benson's material breach, the broker was not obligated to follow Benson's instructions. The broker could stop performing the contract. Restatement (Second) Contracts Sec. 237; 2 E. Farnsworth, Contracts Sec. 8.16 (1990).
 
 
 31
 Moreover, Benson's counterclaim also fails for essentially the same reason his defense is ineffective. He cites no case that applied the measure of damages he seeks to a situation where the customer held as many positions as he did and the market was so volatile that immediate liquidation of the positions would likely disrupt or depress it. The directed verdict against Benson on his counterclaim was appropriate.
 
 
 32
 We find no merit in Benson's other assignments of error. The judgment of the district court is affirmed.